Samuel H. SHEPPARD, Petitioner-
Appellee,

v.

E. L. MAXWELL, Warden, Respondent-
Appellant.

No. 16077.

United States Court of Appeals
Sixth Circuit.

May 5, 1965.

Rehearing Denied July 14, 1965.

Edwards, Circuit Judge, dissented.

William B. Saxbe, Atty. Gen. of Ohio, Columbus, Ohio, John T. Corrigan, Pros. Atty. of Cuyahoga County, Cleveland, Ohio (for amicus curiae), for appellant, David L. Kessler, Asst. Atty. Gen., Columbus, Ohio, on the brief, Gertrude Bauer Mahon, Asst. Pros. Atty., Cleveland, Ohio, on brief for amicus curiae.

F. Lee Bailey, Boston, Mass., for appellee, Benjamin L. Clark, Columbus, Ohio, Russell A. Sherman, Elyria, Ohio, on the brief.

Before O'SULLIVAN, PHILLIPS and EDWARDS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Appellant, Warden of the Ohio State Penitentiary, appeals from a United States District Court order declaring void the 1954 conviction of petitioner, Dr. Samuel H. Sheppard. Judgment had been entered in the Court of Common Pleas of Cuyahoga County, Ohio, upon a jury verdict convicting Sheppard of the second-degree murder of his wife.[1] Upon his appraisal of trial and pretrial publicity and other matters, the District Judge concluded that Dr. Sheppard did not have a fair trial and was thus deprived of rights guaranteed him by the United States Constitution His order granted bail to Dr. Sheppard and released him from the Ohio Penitentiary where he had been confined under a life sentence since his conviction in 1954. Ohio was granted 60 days within which to take further action against Dr. Sheppard. Sheppard v. Maxwell, D.C., 231 F.Supp. 37 (July 15, 1964). This Court has stayed the order fixing such time limitation.

Sheppard's conviction and the denial of his motion for new trial on grounds of newly discovered evidence were both affirmed on appeal by the Court of Appeals for Cuyahoga County, Ohio. State v. Sheppard, 100 Ohio App. 345, 128 N.E. 2d 471 (1955); State v. Sheppard, 100

[1]. Marilyn Sheppard, petitioner's pregnant young wife, was bludgeoned to death in the bedroom of her lakeshore home during the early morning hours of July 4, 1954. Dr. Sheppard told police that he had been wakened from his sleep on a couch in the downstairs living room by a noise or cry from upstairs, ascended the stairs, and was knocked unconscious while grappling with an unidentifiable white "form" standing next to his wife's bed. He further stated that upon recovering, he pursued the form out of the house, to be again knocked out while struggling on the shore. The evidence disclosed that Dr. Sheppard had recently been unfaithful to his wife.

Ohio App. 399, 128 N.E.2d 504 (1955). The Ohio Supreme Court dismissed an appeal from the decision affirming the denial of a new trial in State v. Sheppard, 164 Ohio St. 428, 131 N.E.2d 837 (1956), and affirmed the conviction in State v. Sheppard, 165 Ohio St. 293, 135 N.E.2d 340 (1956), two judges dissenting. Application for certiorari was denied by the United States Supreme Court, Sheppard v. State of Ohio, 352 U.S. 910, 77 S.Ct. 118, 1 L.Ed.2d 119 (1956), and rehearing was denied, Sheppard v. Ohio, 352 U.S. 955, 77 S.Ct. 323, 1 L.Ed.2d 245 (1956). Dr. Sheppard's later petition to the Supreme Court of Ohio for a writ of habeas corpus was denied. State ex rel. Sheppard v. Alvis, 170 Ohio St. 551, 167 N.E.2d 94 (1960). Dr. Sheppard thus has had the benefit of all the processes of law provided by the State of Ohio, and the United States Supreme Court did not see fit to take the case for its review.

The habeas corpus proceeding here involved was commenced in the United States District Court April 11, 1963, charging, as amended, some 23 separate constitutional defects in Sheppard's conviction. Some of these had already been found without merit by the Ohio courts and others were new. Indicating his view that there were probably other constitutional imperfections in Dr. Sheppard's trial, the District Judge bottomed his decision on four separate grounds, (1) newspaper publicity before and during the trial denied Sheppard a fair trial, (2) the trial judge should have disqualified himself, (3) evidence that Sheppard had refused to take a lie detector test and that another witness had taken such a test was improperly brought before the jury, and (4) the bailiffs in charge of the jury after the cause was submitted to it improperly allowed individual jurors to make telephone calls to their families. Grounds 1 and 4 were passed upon in the Ohio Court of Appeals and Supreme Court and were found to be without merit. They were also relied upon in the

application to the United States Supreme Court for certiorari, which was supported by the same volumes of newspaper publicity as are before us. Ground 2 and part of ground 3 were first asserted in the instant petition for habeas corpus.

We are of the opinion that the release of Dr. Sheppard was improvident, and that the District Court order should be vacated and Dr. Sheppard remanded to the custody of the respondent Warden of the Ohio Penitentiary.

Before detailed discussion of the issues before us, it should be preliminarily observed that Dr. Sheppard was released not because of any evidentiary showing that the jury was prejudiced by the newspaper and other publicity or that the trial judge exhibited partiality or prejudice in his conduct of the trial, nor because of any evidence that the jurors' calls to their homes contained any improprieties. The District Judge presumed that the judge and the jury must have been so affected by the publicity and other events as to be unable to discharge their respective responsibilities in keeping with constitutional standards. Reviewing substantially the same record as did the District Judge here, the appellate machinery of Ohio, challenged to do so, was unable to discern the evils now presumed by the District Judge. Aware that as a matter of formal rule, denial of certiorari by the United States Supreme Court does not bespeak its approval of a state court decision, we do mention that critical points now made by Dr. Sheppard did not excite the Supreme Court to take for review this case now characterized by the District Judge as "a mockery of justice."

The District Judge's comprehensive and painstakingly prepared opinion exhibits his searching and laudable zeal to protect Dr. Sheppard's constitutional rights. He cast a wide and fine net over Dr. Sheppard's trial and its background, gathering in many imperfections each of which was found to have offended the United States Constitution.[2] This con-

---

2. The District Judge said, "The Court * * * has found five separate viola-

tions of petitioner's constitutional rights, i. e., failure to grant a change of venue

clusion is reached notwithstanding that on the main points discussed some nine Ohio judges of the Common Pleas Court, the Court of Appeals, and the Supreme Court, did not find error or constitutional vice in the Sheppard trial and that the case "did not commend itself to at least four members of the [United States Supreme] Court as falling within those considerations which should lead this Court to exercise its discretion in reviewing a lower court's decision." Sheppard v. State of Ohio, 352 U.S. 910, 911, 77 S.Ct. 118, 119, 1 L.Ed.2d 119 (remarks of Frankfurter, J.). Other points now found to be of constitutional magnitude evidently did not appear of sufficient significance to prompt Dr. Sheppard's counsel to assert them as error on appeal.

Aside from the question of lie detector evidence, which we find without merit, the judgment of the District Court cannot be affirmed unless we are willing to accept its conclusion that the jurors who heard this case were, wittingly or unwittingly, false to their oaths; or that the trial judge, deceased before the start of this habeas corpus proceeding, was guilty of impropriety in sitting as a judge at the Sheppard trial. We cannot join in such conclusions, notwithstanding our agreement with the District Judge's characterization of the conduct of some of the Cleveland press as being shameful journalism, certainly not conducive to the judiciary's continuing concern for the freedom that the press insists should at all times be accorded to it. Contemporary American society would be greatly benefited if those members of the press and other media of information who offend in this regard were as conscious of and devoted to their responsibilities as

they are solicitous that their privileges remain unimpaired. Good would also be the product of greater restraint by prosecutors and other members of the bar who indulge in public and truculent announcement of their trial plans and ammunition.

■ An initial question should be disposed of. The respondent warden now charges that the District Court was without jurisdiction to entertain the instant habeas corpus action, asserting that Dr. Sheppard has not exhausted remedies still available in the state courts of Ohio, citing 28 U.S.C.A. § 2254. He contends that application for delayed appeal is still available to petitioner under Ohio Revised Code § 2953.05 as to errors not already considered by the Ohio court, and that under Ohio Revised Code § 2725.02, habeas corpus may also be presently employed to present federal constitutional questions to the Ohio courts. In his answer to the petition for habeas corpus, however, respondent admitted "that petitioner has exhausted all his remedies in the courts of Ohio. * * *" Whether such response constitutes a judicial admission foreclosing present consideration of the jurisdictional question and whether, assuming the court's right to now consider exhaustion of remedies, petitioner has exhausted his state remedies as required by 28 U.S.C.A. § 2254, are interesting questions. We pass them, however, believing that since the District Judge has entertained the application for habeas corpus and ruled on the merits, we have the right to, and should, dispose of the appeal before us on its merits. Particularly is this so since the result of our determination is in a sense a vindication of the state courts. Compare the Third Circuit rule that exhaustion is not

or a continuance in view of the newspaper publicity before trial; inability of maintaining impartial jurors because of the publicity during trial; failure of the trial judge to disqualify himself although there was uncertainty as to his impartiality; improper introduction of lie detector test testimony and unauthorized communications to the jury during their deliberations. *Each* of the aforementioned errors is *by itself* sufficient to require a

determination that petitioner was not afforded a fair trial as required by the due process clause of the Fourteenth Amendment. And when these errors are cumulated, the trial can only be viewed as a mockery of justice. For this reason, it is not necessary to consider the remainder of the 23 stipulated issues, which range from having *significant merit* to no merit at all." 231 F.Supp. 71. (Emphasis supplied.)

required prior to a ruling against the merits of a state prisoner's petition, United States ex rel. Drew v. Myers, 327 F.2d 174 (CA 3, 1964) ; In re Thompson, 301 F.2d 659 (CA 3, 1962) ; In re Ernst, 294 F.2d 556 (CA 3, 1961), cert. denied, 368 U.S. 917, 82 S.Ct. 198, 7 L.Ed.2d 132 (1961).

We shall discuss the merits under the headings of Publicity, Disqualification of Judge Blythin, Lie Detector Evidence, Communications with Jurors, and Other Questions.

### 1) *Publicity.*

■ We should at the outset confess a certain temptation to yield to today's accelerating current of excitement and concern about undue press coverage of criminal charges and trials, and to affirm petitioner's release as dramatic vindication of the bar's contention that some of its own members and some of the various media of information have by misuse of their rights prevented our courts from according fair trial to all who are accused of crime. Doubts as to the efficacy and propriety of such action, however, are supplemented by the certain knowledge that it is our duty as federal judges to avoid a state judgment of conviction only where some constitutional infirmity may be found. Careful consideration of this case leads to the conclusion that no such infirmity infects Dr. Sheppard's conviction. The frequently quoted prefatory paragraph to the opinion of Judge Bell, who wrote for the Ohio Supreme Court in affirming the conviction of Dr. Sheppard, provides appropriate introduction to the publicity aspect of the present case:

"Murder and mystery, society, sex and suspense were combined in this case in such a manner as to intrigue and captivate the public fancy to a degree perhaps unparalleled in recent annals. Throughout the pre-indictment investigation, the subsequent legal skirmishes and the nine-week trial, circulation-conscious editors catered to the insatiable interest of the American public in the bizarre. Special seating facilities for reporters and columnists representing local papers and all major news services were installed in the courtroom. Special rooms in the Criminal Courts Building were equipped for broadcasters and telecasters. In this atmosphere of a 'Roman holiday' for the news media, Sam Sheppard stood trial for his life." 165 Ohio St. 294, 135 N.E. 2d 342.

It should be observed here, however, that no rule of law, no procedural device, and no constitutional guarantee could then or now erase the murder of Dr. Sheppard's wife or its circumstances; such events inevitably cast the Sheppard trial into the setting so graphically described by Judge Bell. Judge Bell's accurate observation, in our view, merely demonstrates that the Ohio Supreme Court was fully aware of the subject before it. The fact that two of the Ohio judges dissented bespeaks the searching and vigor that must have attended the deliberations of the seven judges whose decision ended Ohio's appellate review of the matter now before us.

The Supreme Court of the United States also had Judge Bell's preface before it. Justice Frankfurter recited it in full in his memorandum. The main points earnestly pressed upon the District Judge and this Court are not the belated discovery of Dr. Sheppard's present counsel.

■ Before examining in detail the nature of the publicity given Dr. Sheppard's case, it is well to note that he must carry the burden of demonstrating the constitutional vice in his conviction. As stated by the First Circuit in another publicity case, "[t]he question whether jurors are impartial in the constitutional sense is one of mixed law and fact as to which the challenger has the burden of persuasion * * *." Geagan v. Gavin, 292 F.2d 244, 246 (CA 1, 1961), cert. denied, 370 U.S. 903, 82 S.Ct. 1247, 8 L.Ed.2d 399 (1962). This burden is one which must be carried " 'not as a matter of *speculation but as a demon-*

*strable reality.'* " United States ex rel. Darcy v. Handy, 351 U.S. 454, 462, 76 S.Ct. 965, 100 L.Ed. 1331, 1338 (1956) (emphasis supplied); Stroble v. State of California, 343 U.S. 181, 198, 72 S. Ct. 599, 607, 96 L.Ed. 872, 885 (1952). See also Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268, 276 (1942).

 Formally, the errors charged in this area of publicity are the District Judge's denial of motions for a change of venue, for a postponement of trial, and for mistrial.[3] It is the law of Ohio that these are matters for a trial judge's discretion, not subject to review except for abuse thereof. Townsend v. State, 17 Ohio Cir.Ct.R., N.S., 380, 25 Ohio Cir. Dec. 408, aff'd, 88 Ohio St. 584, 106 N.E. 1083 (1913); Richards v. State, 43 Ohio App. 212, 215, 183 N.E. 36 (1932); Dorger v. State, 40 Ohio App. 415, 419, 179 N.E. 143 (1931), appeal dismissed, 124 Ohio St. 659, 181 N.E. 881 (1931),

cert. denied, 284 U.S. 689, 52 S.Ct. 265, 76 L.Ed. 581 (1932); State v. Stemen, 90 Ohio App. 309, 310, 106 N.E.2d 662 (1951), cert. denied, 342 U.S. 949, 72 S. Ct. 564, 96 L.Ed. 705 (1952); State v. Deem, 154 Ohio St. 576, 97 N.E.2d 13 (1951); State v. Sheppard, 165 Ohio St. 293, 296, 135 N.E.2d 340 (1956), cert. denied, 352 U.S. 910, 77 S.Ct. 118, 1 L. Ed.2d 119 (1956). Such is the law in other states. 24A C.J.S. Criminal Law §§ 1864, 1865, 1866, p. 715 & n. 16 (1962). And dealing particularly with allegedly prejudicial publicity, this is the Federal rule as well. Estes v. United States, 335 F.2d 609, 614 (CA 5, 1964), cert. denied, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965); United States v. Lombardozzi, 335 F.2d 414, 416–417 (CA 2, 1964), cert. denied, 379 U.S. 914, 85 S.Ct. 261, 13 L.Ed.2d 185 (1964); Hoffa v. Gray, 323 F.2d 178 (CA 6, 1963), cert. denied, 375 U.S. 907, 84 S.Ct. 199, 11 L.Ed.2d 147 (1963); United States v. Decker, 304 F.2d 702, 704 (CA 6,

3. A stipulation of issues in the District Court raised the questions whether petitioner's rights were violated by publication of a list of veniremen in advance of trial, or by the trial judge's failure to sequester the jury *sua sponte*. The District Judge stated these issues were considered under the publicity heading, and it appears that he found a deprivation of due process in each claim. We are unable to agree.

As a lawyer who through many years has observed the regular publication of the names of the venire in the local paper in advance of the term at which they were to serve, the writer of this opinion finds novel indeed the contention that "the publication of a list of veniremen thirty days in advance of trial, thus subjecting said veniremen to opinions of others during the thirty day period [was] a violation of petitioner's constitutional rights." Neither citation of authority nor judicial reason is offered in support of this claim, and we find it unpersuasive.

We find equally unpersuasive the claim based on failure to sequester the jury. No formal request therefor was made at any time by the prosecution or defense. We cannot speculate now whether able defense counsel would have welcomed such a procedure, or whether long insulation and confinement of a jury trying a first degree murder case might be thought more likely to lead to conviction and a death penalty than permitting a jury the relaxation and refreshment of living at home, even with the possible exposure to extracurial publicity. Eminent advocates might be in disagreement on the point. Cf. United States v. Provenzano, 334 F. 2d 678, 696 (CA 3, 1964), cert. denied 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). We cannot now speculate as to why defense counsel withheld such a request. There is no record to tell us whether the suggestion may have been made in Chambers and there opposed by defense counsel. That point was never made to the Ohio courts. And we will certainly not, in the context of this case and at this distance, find constitutional vice in the trial judge's failure to do what was not requested of him. Compare Odell v. Hudspeth, 189 F.2d 300, 303 (CA 10, 1951), cert. denied, 342 U.S. 873, 72 S. Ct. 116, 96 L.Ed. 656 (1951); Wheeler v. United States, 82 U.S.App.D.C. 363, 165 F.2d 225, 229 (1947), cert. denied, 333 U.S. 829, 68 S.Ct. 448, 92 L.Ed. 1115 (1948); Stephan v. United States, 133 F.2d 87, 99 (CA 6, 1943), cert. denied, 318 U.S. 781, 63 S.Ct. 858, 87 L.Ed. 1148 (1943). It should be noted here that his failure to sequester the jury *sua sponte* was not charged as error on Sheppard's appeal.

1962); Bearden v. United States, 304 F.2d 532 (CA 5, 1962), vacated on other grounds, 372 U.S. 252, 83 S.Ct. 875, 9 L.Ed.2d 732 (1963), on remand, 320 F.2d 99, 101–103 (CA 5, 1963), cert. denied, 376 U.S. 922, 84 S.Ct. 679, 11 L.Ed.2d 616 (1964); Greenhill v. United States, 298 F.2d 405 (CA 5, 1962), cert. denied, 371 U.S. 830, 83 S.Ct. 25, 9 L.Ed.2d 67 (1962); Blumenfield v. United States, 284 F.2d 46, (CA 8, 1960), cert. denied, 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692 (1961); Dillon v. United States, 218 F.2d 97, 103 (CA 8, 1955), cert. dismissed, 350 U.S. 906, 76 S.Ct. 191, 100 L.Ed. 796 (1955); Kersten v. United States, 161 F.2d 337 (CA 10, 1947), cert. denied, 331 U.S. 851, 67 S.Ct. 1744, 91 L.Ed. 1859 (1947); Shushan v. United States, 117 F.2d 110, 133 A.L.R. 1040 (CA 5, 1941), cert. denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941); United States v. Hirsch, 74 F.2d 215, 218–219 (CA 2, 1934), cert. denied, 295 U.S. 739, 55 S.Ct. 653, 79 L.Ed. 1686 (1935).

In the case at bar, the trial judge held in abeyance the motions for change of venue and for continuance, advising that he would first by a voir dire examination determine whether a fair jury could be selected notwithstanding the alleged prejudicial publicity. Under Ohio law, this was proper procedure. Prior to Dr. Sheppard's conviction, the Ohio Supreme Court had approved a lower court statement,

> "The examination of jurors on their *voir dire* affords the best test as to whether or not prejudice exists in the community against the defendant; and where it appears that the opinions as to the guilt of the defendant of those called for examination for jurors are based on newspaper articles and that the opinions so formed are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue." Townsend v. State, supra.

In sustaining the conviction of Dr. Sheppard, the Ohio Supreme Court said,

> "For example, in Richards v. State, 43 Ohio App. 212, 183 N.E. 36, it was held that the exercise of the right to order a change of venue lies in the trial court's discretion, and that a refusal to order a change of venue without prejudice until it can be determined whether a fair and impartial jury can be impaneled is not an abuse of discretion. * * *

> "If the jury system is to remain a part of our system of jurisprudence, the courts and litigants must have faith in the inherent honesty of our citizens in performing their duty as jurors courageously and without fear or favor. Of the 75 prospective jurors called pursuant to this venire only 14 were excused because they had formed a firm opinion as to the guilt or innocence of the defendant. A full panel was accepted before this venire was exhausted, and defendant exercised but five of his allotted six peremptory challenges.

> "In the light of these facts, and particularly in the light of the fact that a jury was impaneled and sworn to try this case fairly and impartially on the evidence and the law, this court can not say that the denial of a change of venue by the trial judge constituted an abuse of discretion." State v. Sheppard, 165 Ohio St. 296–297, 135 N.E.2d 343.

In determining whether Dr. Sheppard has carried the burden of demonstrating the unconstitutionality of his trial, surrounded as it was by pervasive publicity, it is our duty to review independently this voir dire examination of the prospective jurors in the state court. Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); United States ex rel. Bloeth v. Denno, 313 F.2d 364, 372 (CA 2, 1963), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963); United States ex rel. Brown v. Smith, 306 F.2d 596, 602 (CA 2, 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1012, 10 L.Ed.2d 11 (1963); Geagan v. Gavin, supra, 292 F.2d 246–247. The voir dire

examination fills nearly 1600 pages in the record of the present case. Each prospective juror was questioned about his acquaintance with the pretrial publicity, and each of those who ultimately returned the guilty verdict swore that such publicity had created in his mind no opinion as to the guilt or innocence of the defendant and would not affect his deliberations. A reading of the voir dire discloses its thoroughness and careful inquiry as to any effect that publicity might have had on the veniremen. We find it without substantial fault and neither has counsel pointed to any insufficiency or impropriety in it. We indeed find no justification for present counsel's assertion that the City of Cleveland had been turned into a "jungle of wolves." [4] Our own review of the voir dire transcript makes it clear that the extensive questioning of each juror by the court and counsel, and the admonitions given them, forcefully impressed on their consciences their solemn responsibility and their duty to consider nothing but what properly came before them in the courtroom. Since it is obvious that this examination of the jurors affords no support for petitioner's position, the only part of the publicity question that remains in the case, as it has been submitted to us, is whether there exists some basis for disregarding the jurors' unanimous sworn statements of impartiality. We are offered nothing to support a finding of mass perjury—or unwitting incompetence of the jurors to obey their oaths—beyond the nature of the publicity itself. The District Court ruled, however, that "This Court * * * has no compunction in finding that the publicity was so prejudicial to petitioner that *the assurances of the jurors must be disregarded* * * *." 231 F.Supp. 59.

(Emphasis supplied.) Summarizing this conclusion in different words, the opinion further states that "the prejudicial effect of the newspaper publicity was so manifest that no jury could have been seated at that particular time in Cleveland which would have been fair and impartial regardless of their assurances or the admonitions and instructions of the trial judge." 231 F.Supp. 60. To evaluate this finding we must turn to a brief summary of the pretrial publicity involved. We need not choose between one gentle characterization of some of this publicity by the Ohio Attorney General as "nothing more than inane and innocuous reporting" and present counsel's borrowed condemnation of the Sheppard trial as " 'a God-damned shame.' " The District Judge's opinion details what we assume he considered the worst of it. From his recital and our own review, we attempt a general summary of its character. It began with the report of the murder of Mrs. Sheppard. The brutality of the murder and Dr. Sheppard's version of its bizarre circumstances combined to make it front page, headline news. This was as inevitable as the immediate speculation by officials and the public as to who had done it. Early news stories contained accounts of police efforts to question Dr. Sheppard and noted the fact that from the day of the murder he generally acted, and talked to police only with the advice and direction of two lawyers, Arthur Petersilge and William Corrigan, the latter a leader of the criminal bar of Cleveland. Throughout were many human interest stories laudatory of Dr. Sheppard's career. His own, his brother's and his attorneys' extensive exculpatory statements were also given front page prominence. Soon, however, and with increasing impatience, there

4. The trial judge's awareness of the importance of the voir dire is portrayed by the following admonition, given to some prospective alternate jurors:

"A fair and an impartial juror is a juror who can sit here patiently and who can listen to all of the evidence that is produced in a case and to the instructions of the court as to the law applica-

ble to the particular case, and who can honestly close out the rest of the world for the moment and bring a curtain down on all information he may have about the matter from other sources, and be guided entirely by the evidence and the instructions of the Court as to the law applicable to the particular case."

began to appear news items evidencing the press' belief that Dr. Sheppard was being unduly sheltered. The Cleveland Press in particular became violently critical of what its editor considered a failure of police authorities to press investigation of the crime. It urged quick apprehension and "grilling" of the deceased's husband, who was at least once characterized as the "chief suspect." Dr. Sheppard's refusal to take a lie detector test was headlined, but attention was also given to his explanation that he felt that such testing could be misleading because of his emotional condition and his doubt of the reliability of such tests. It was intimated that Bay Village authorities, friendly to Dr. Sheppard, were joining his attorneys in surrounding him with undeserved protection. Certainly little sophistication was required for a reader to become aware that the Cleveland Press entertained strong suspicion that Dr. Sheppard had killed his wife, although at times the Press suggested that Sheppard should clear suspicion from himself by submitting to adequate questioning. All of this was indeed stated in more violent and colorful language than we employ in attempting to summarize it. Accompanying the accounts of the progress of the investigation were reports of Dr. Sheppard's steadfast denial of guilt and presumably accurate accounts of his own early, self-exculpatory narration of the events of the murder night. The press has always claimed the right to prod public officials, obedient to what it considers its high duty to protect the public weal; it frequently presses the exercise of this claimed right with crusading zeal. That it can be wrong and that often it sacrifices good taste and fairness to circulation is rarely admitted by the fourth estate. Certainly the Cleveland Press' discharge of its claimed duty in the Sheppard case could have been adequately pursued with less obtrusiveness. We need not here decide whether the Bay Village authorities, or the Cuyahoga County coroner or the Cleveland police did or did not need the urging provided by the Cleveland Press.[5] It has not been asserted that the police authorities were without the faults charged to them, although it might fairly be inferred that the Press' meddling probably impeded more than it helped.

It should be emphasized that nowhere in the news items is there any hint or suggestion that Dr. Sheppard confessed or admitted his guilt, or any claim that he had a criminal record or had been other than an exemplary citizen, or any clear assertion that the press or the police had any direct evidence of his guilt. Comments to the press by police officials, and even prosecutors, occasionally exceeded the bounds of propriety, but they too revealed no more than that some thought that Dr. Sheppard was guilty. In addition to the pretrial publicity set forth in the District Court opinion, the Cleveland papers also published items emphasizing Dr. Sheppard's protestations of innocence.[6]

5. The dissent states that a Cleveland Press representative made a public boast that his paper's handling of the Sheppard story produced the trial. We cannot accurately assess the Press' self-evaluation of its own journalistic prowess.

6. Samples of headlines in the Cleveland Press, the Cleveland News, and the Cleveland Plain Dealer are:
"Exclusive! 'I Loved My Wife—She Loved Me,' Sheppard Tells News Reporter."
"Dr. Sam Writes His Own Story."
"I am Not Guilty of the Murder of My Wife, Marilyn. How could I, who have been trained to help people and devoted my life to saving life, commit such a terrible and revolting crime?"
"Sheppard Lawyers Hit Stories on Murder."
"Dr. Sheppard's Statement Issued to Answer Gossip."
"Bay Doctor Talks to Reporter."
"Husband Puts $10,000 up For Slayer."
"Text of Doctor's Statement on his Offer of Reward."
"Doctor Will Help in Hunt for Death Weapon Today."
"Honored Athlete at Heights High."

We turn then to the two cases relied upon by the District Court in ruling that such pretrial publicity per se deprived petitioner of a fair trial, Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), and Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In each case the United States Supreme Court set aside state court convictions which had been affirmed in the highest courts of those states against charges of prejudicial publicity. It held that the prejudice in each case was so great that traditional voir dire procedures and admonitions were unavailing to insure a fair trial. It is clear that the publicity involved in these cases was significantly different from the publicity surrounding Dr. Sheppard. In Irvin v. Dowd, the Indiana court had denied a second change of venue. The Supreme Court recited these facts:

" 'Six murders were committed in the vicinity of Evansville, Indiana, two in December 1954, and four in March 1955. The crimes, extensively covered by news media in the locality, aroused great excitement and indignation throughout Vanderburgh County, where Evansville is located, and adjoining Gibson County, a rural county of approximately 30,000 inhabitants. The petitioner was arrested on April 8, 1955. Shortly thereafter, the Prosecutor of Vanderburgh County and Evansville police officials issued press releases, which were intensively publicized, *stating that the petitioner had confessed to the six murders.'*

" * * * curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations. * * * These stories [newspaper, radio and T.V.] revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced *his confession to the six murders* and the fact of his indictment for four of them in Indiana. They reported *petitioner's offer to plead guilty* if promised a 99-year sentence, but also *the determination,* on the other hand, of the *prosecutor to secure the death penalty,* and that

"Dr. Sheppard Returns to Bay View Hospital to Treat his Patients."

"Drunk 'Confesses' but Story Fizzles."

"Dr. Sheppard Tells Press 'Killer Will Be Caught.' "

"Text of Statement by Corrigan After Arrest of Client, Dr. Sam."

"Police Cordial, Polite as They Take Sheppard."

"Family Points to Bay Man as New Suspect as Hoversten Talks."

"Dr. Sam is Anxious to Take Stand, His Brother Says."

"Battles Prowler in Bay. Corrigan Links Boy's Story With Sheppard Case."

"Dr. Steve Hits 'Red Herring' Accusation."

"Dr. Sam Just Like Brother, 2 Sisters-in-law Say at Trial."

"Dr. Sam Says: 'I Wish There Was Something I Could Say—But There Isn't.' "

"Jail Mate Says Dr. Sam Talks of His Innocence."

"Brother Says Police Aimed to Play on Dr. Sam's Concern."

"Brother Says Dr. Sam Anxious to Take the Witness Stand."

"Not Guilty, Sheppard Says; Asks No Bail."

"Can't Get Fair Trial—Dr. Sam."

"Own Sleuth Put on Case by Corrigan."

"Dr. Steve Challenges Prosecutor's Charge."

"Sheppard Home Bloodstains Are Proven Animal's." [By defense tests.] These headlines were followed by text supporting Dr. Sheppard's claim of innocence.

petitioner had confessed to 24 burglaries (the *modus operandi* of these robberies was compared to that of the murders and the similarity noted). One story dramatically relayed the promise of a sheriff to devote his life to securing petitioner's execution by the State of Kentucky, where petitioner is alleged to have committed one of the six murders, if Indiana failed to do so. * * * On the day before the trial the newspapers carried the story that Irvin *had orally admitted the murder of Kerr* (the victim in this case) *as well as 'the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky.'* " 366 U.S. 719–720, 725–726, 81 S.Ct. 1644. (Emphasis supplied.)

Turning then to the attempt to select an impartial jury, the Supreme Court went on:

"The panel consisted of 430 persons. The court itself excused 268 of those on challenges for cause as having fixed opinions as to the guilt of petitioner; 103 were excused because of conscientious objection to the imposition of the death penalty; 20, the maximum allowed, were peremptorily challenged by petitioner and 10 by the State; 12 persons and two alternates were selected as jurors. * * * An examination of the 2,783-page *voir dire* record shows that 370 prospective jurors or almost 90% of those examined on the point (10 members of the panel were never asked whether or not they had any opinion) entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty." 366 U.S. 727, 81 S.Ct. 1645.

"Here the 'pattern of deep and bitter prejudice' shown to be present throughout the community * * was clearly reflected in the sum total of the *voir dire* examination of a majority of the jurors finally placed in the jury box. *Eight out of the 12 thought petitioner was guilty.*" Ibid. (Emphasis supplied.)

Coming to the other case chiefly relied upon by the District Court, Rideau v. State of Louisiana, we find its facts, like those in Irvin v. Dowd, gravely undermine any claim that it supports Dr. Sheppard's position. Rideau also involved a state court's denial of a motion for change of venue, made on the ground that public knowledge of the crime in the parish prevented the selection of an impartial jury. The Supreme Court's following recital of the facts at once exposes its inappositeness here.

"On the evening of February 16, 1961, a man robbed a bank in Lake Charles, Louisiana, kidnapped three of the bank's employees, and killed one of them. A few hours later the petitioner, Wilbert Rideau, was apprehended by the police and lodged in the Calcasieu Parish jail in Lake Charles. The next morning a moving picture film with a sound track was made of an 'interview' in the jail between Rideau and the Sheriff of Calcasieu Parish. This 'interview' lasted approximately 20 minutes. It consisted of interrogation by the sheriff *and admissions by Rideau that he had perpetrated the bank robbery, kidnapping, and murder.* Later the same day the filmed 'interview' was broadcast over a television station in Lake Charles, and some 24,000 people in the community saw and heard it on television. The sound film was again shown on television the next day to an estimated audience of 53,000 people. The following day the film was again broadcast by the same television station, and this time approximately 29,000 people saw and heard the 'interview' on their television sets. Calcasieu Parish has a population of approximately 150,000 people.

* * * * * *

*"Three members of the jury which convicted him had stated on voir dire that they had seen and heard Ri-*

*deau's televised 'interview' with the sheriff on at least one occasion. Two members of the jury were deputy sheriffs of Calcasieu Parish.* Rideau's counsel had requested that these jurors be excused for cause, having exhausted all of their peremptory challenges, *but these challenges for cause had been denied by the trial judge."* 373 U.S. 723–725, 83 S.Ct. 1417–1418. (Emphasis supplied.)

Mr. Justice Stewart, after observing that "the plan [the filming of the confession and its telecast] was carried out with the active cooperation and participation of the local law enforcement officers," concluded that "without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, * * * due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.'"

We are of the opinion that neither Irvin nor Rideau support a holding that the jurors' testimony had to be rejected by the trial judge and that a fair jury could not possibly have been obtained in this case.

In Irvin, the Court was dealing with a case where eight of the twelve jurors thought the defendant guilty, some of them stating that evidence would be needed to overcome this belief. The basic thrust of the Court's holding is found in its conclusion that "it would be difficult to say that each [of the eight opinionated jurors] could exclude this preconception of guilt from his deliberations." It was only against this background that the Court ruled that the trial court should have rejected the jurors' statements that they could render an impartial verdict despite their opinions. These vitiating opinions, moreover, were formed on the basis of publicity not only of Irvin's criminal record, but of statements that he had actually confessed to several murders, including the one for which he was convicted. In the present case, the publicity contained accusation only by innuendo.

So far as Irvin is concerned, indeed, it would seem that Dr. Sheppard was accorded rather more than the constitution requires, for each of the twelve jurors who voted to convict him testified they were entirely free of any opinion as to his guilt or innocence. The Court in Irvin, by way of contrast, ruled that

"To hold that the mere existence of *any preconceived notion as to the* guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. 723, 81 S.Ct. 1642.

Irvin, we think, provides no basis for ruling that the publicity in the present case was such as to "rebut the presumption of a prospective juror's impartiality."

The facts of Rideau set it even further apart from Dr. Sheppard's case. To ask three jurors to put entirely aside the visual spectacle of a confession by the very defendant they are charged to presume innocent is indeed close to demanding the impossible. To believe that the balance of that jury could remain ignorant of what their fellow jurors knew would be folly. It was far different, and we think not unreasonable, to ask a jury to ignore the suspicions and accusations of the press in deliberating Dr. Sheppard's guilt or innocence. Compare Bearden v. United States, 320 F.2d 99, 101–103 (CA 5, 1963), cert. denied, 376 U.S. 922, 84 S.Ct. 679, 11 L.Ed.2d 616 (1964).

While it was not expressly relied upon by the District Court, we believe that the decision in United States ex rel. Bloeth v. Denno, 313 F.2d 364 (CA 2, 1963), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963) is distinguishable upon the same grounds as Irvin and Rideau.

Other cases relied upon by the District Court, Delaney v. United States, 199

F.2d 107 (CA 1, 1952); Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); United States v. Accardo, 298 F.2d 133 (CA 7, 1962); Krogmann v. United States, 225 F.2d 220 (CA 6, 1955), are all immediately distinguishable as cases involving the exercise by federal appellate courts of their supervisory power over trials in the district courts. But they are further distinguishable on their facts. In Delaney the pretrial publicity about an accused Collector of Internal Revenue, Delaney, included extensive coverage of public hearings before a congressional subcommittee investigating his alleged criminality and misfeasance which the court said "afforded the public a preview of the prosecution's case against Delaney," without the safeguards of a trial. It included evidence of Delaney's bankruptcy, charges of larceny and embezzlement, and a public announcement by the committee chairman referring to the "deplorable activities of * * * Mr. Delaney" and the committee's effort to find out "why this betrayal has occurred." The court further emphasized that the federal government, prosecutor in the criminal case, was itself responsible for much of the publicity. In Marshall, publicity appeared during the trial which included information of alleged previous felony convictions involving forgery, of previous violation of the drug laws, and of an identification of Marshall as one who had prescribed restricted drugs "for Hank Williams before the country singer's death." The defendant did not take the stand, but all of the above was admittedly communicated to several members of the jury through news accounts. The Supreme Court was careful to point out that reversal was "[i]n the exercise of our supervisory power to formulate and · apply proper standards for enforcement of the criminal law in the federal courts. * * *" In Accardo the accused did not take the stand, but the newspapers published accounts of his criminal record and other inflammatory material comparing Accardo with Capone and calling him "the master of muscling legitimate business." Also the court found inadequate the district judge's admonitions to the jury to avoid all news accounts of the case. In Krogmann the offending publicity erroneously asserted that one of the defendants had admitted the offense charged during his trial testimony and this Court, exercising its supervisory power, found error in the trial judge's handling of the matter after discovering that two of the jurors had read the accounts. Our review of these last considered cases leaves us unconvinced of their importance to the issue before us.

We have emphasized above that the publicity involved in the present case was not of a nature calculated to inspire confidence in the objectivity and good taste of the public news media. But neither was it of a nature calculated to create lasting opinions as to Dr. Sheppard's guilt. Surmise, conjecture, and accusation were substituted for confession, criminal record, or direct evidence. We are not prepared now to hold that American citizens have so far forgotten their traditional heritage of "fair play" that such shabby reporting would irretrievably infect the minds of an entire metropolitan community. Our jury system cannot survive if it is now proper to *presume* that jurors, selected with the care taken in this case, are without the intelligence, courage and integrity necessary to their obedience to the law's command that they ignore the kind of publicity here involved. We are left rather in the position of the Court in Beck v. Washington, 369 U.S. 541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962), where "[w]e cannot say the pretrial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law."

Our negative holding that Dr. Sheppard has not demonstrated an adequate basis in the pretrial publicity for disregarding the jurors' assertions of impartiality would be sufficient to dispose of this aspect of his petition. We prefer,

however, to emphasize the affirmative reasons for refusing to ignore those assertions. Federal courts frequently employ the very tactic here employed by Judge Blythin, postponing their rulings on motions for change of venue until an attempt to impanel a jury has revealed whether it is possible to find impartial jurors. E. g., Hoffa v. Gray, 323 F.2d 178, 180 (CA 6, 1963), cert. denied, 375 U.S. 907, 84 S.Ct. 199, 11 L.Ed.2d 147 (1963); Blumenfield v. United States, 284 F.2d 46, 51 (CA 8, 1960), cert. denied, 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed. 2d 692 (1961); United States v. Kline, 205 F.Supp. 637, 638 (D.Minn.1962); United States v. Hoffa, 156 F.Supp. 495, 499 (S.D.N.Y.1957); United States v. Dioguardi, 20 F.R.D. 33, 36 (S.D.N.Y. 1956); United States v. Dioguardi, 147 F.Supp. 421, 422 (S.D.N.Y.1956). The trial judge in such a situation is in the best position to evaluate the testimony of prospective jurors, and accordingly it is he who must bear the brunt of determining whether a fair trial is possible. Wolfe v. Nash, 313 F.2d 393, 397 (CA 8, 1963), cert. denied, 374 U.S. 817, 83 S.Ct. 1713, 10 L.Ed.2d 1041 (1963); Mayo v. Blackburn, 250 F.2d 645 (CA 5, 1957), cert. denied, 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813 (1958); United States v. Bando, 244 F.2d 833, 838 (CA 2, 1957), cert. denied, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957). As stated by the court in the Mayo case,

> "Whether the adverse publicity prevented the appellee from securing a fair trial was a question primarily addressed to the judgment of the trial court. * * * It properly accorded weight to the examination of the jurors on voir dire and to the lack of difficulty in choosing a jury. * * * It was on the ground at the time of trial; it saw and heard the voir dire examination of the jurors; it was in much better position to know the local sentiment and to hear and decide the motion for change of venue than was the federal district court." 250 F.2d 648.

After the jury had been selected and before the examination of prospective alternate jurors, Judge Blythin again overruled the motions for change of venue or a continuance, stating that

> "the best evidence in the world is the effort to select a jury, and what we get here in a picture that has taken almost two weeks of time. The Court is thoroughly satisfied that we have here a fair and impartial group of people to try this case, and I doubt if under any conditions at any time anywhere in this state you could have a better looking group of people and a more intelligent group of people, as a whole, to try a case of this kind, and the Court is thoroughly satisfied that they are a group of fair and impartial people who can properly try this case under the guidance of the Court, and I hope we will be able to give them that in the manner that it ought to be given."

Our examination of the entire record leaves us convinced that there is no basis for rejecting this considered judgment by the one judge most qualified to make it.

Pretrial publicity is not the only focus of the District Court's ruling that the news media deprived Dr. Sheppard of a fair trial. The widespread publicity surrounding the trial itself is also summarized in the opinion below, outlining articles which for the most part involve reporters' recitation of evidence given and events occurring at the trial. One article reported that a prospective witness would testify that Marilyn Sheppard had referred to her husband as a "Dr. Jekyll and Mr. Hyde." This witness did testify, but did not disclose such an incident. Aside from this article, it is not claimed that however colorful, the accounts of the trial were substantially inaccurate.

We feel no need to expand on the nature of this trial publicity, for petitioner's claim of constitutional error on this account is controlled by considerations rather different from those we have just

explored. Varying degrees of exposure to the pretrial publicity were admitted by the jurors on voir dire, but with the single exception of the Winchell broadcast noted below there is no specific showing that any of the jurors had any contact with the trial publicity.

Petitioner emphasizes one article appearing during the trial entitled "But who will speak for Marilyn?" Whether we borrow the Ohio Attorney General's words and characterize this effort at impassioned prose as "inane and innocuous" reporting, or as the author's amateurish reach for immortality, we have more confidence in American jurors than to believe they would be made faithless to their oaths by reading it, *if in fact any of them did.*

Our own review of the record in this case discloses that the trial judge, from the beginning of the trial to its end, repeatedly employed traditional admonitions to the jury reminding them of their duty and oath to hear and try the case before them solely upon the evidence adduced in the courtroom. Because of its thoroughness, we set out in full an early charge to the whole jury:

> "And will you, ladies and gentlemen, be kind enough again to observe the caution which the Court has heretofore expressed to you? And I will repeat it again for the benefit of the two new jurors who have come, alternate jurors who have come into the picture.

> "You are not to talk about this case to anyone. You are not to permit anyone to talk about it to you. You are not to remain anywhere where other people are talking about it among themselves. You are not to talk about it among yourselves, in your jury room or elsewhere.

> "It is your duty as an individual juror and responsible citizens to keep your own counsel, to listen to the evidence that comes from this witness stand and the instructions of the Court as to the law and wait until all those are complete before you form any opinion or judgment whatever as to the outcome of this case, which opinions and judgments are to be expressed only in your jury room after the case has been finally submitted to you for deliberation and decision.

> "I would suggest to you, too, and this is particularly directed to those who have come in today, that you do not during the pendency of the trial listen to comments about it over the radio or otherwise and do not read newspapers. Have somebody preserve those for you, and you can read them—that is, as far as this case is concerned—have the reports of this case taken out and have them preserved for you, and you may read them to your heart's content after this case is disposed of. I say that because I think you will feel better and you will be better.

> "Mr. Corrigan [Chief defense counsel]: May I have the Court state to the jury that they will know more about this case than what will appear in the newspapers?

> "The Court: Yes, indeed. You understand, ladies and gentlemen, the entire community has had through news media of this kind, that kind and the other, and discussion by people who really know nothing whatever about the case, probably, and there have been all kinds of things floating around, there is no dispute about that anywhere, but you will get here the only facts that you are to consider in the determination of this case. They will be presented by the State, and then the defense will have its opportunity to present its views, if there are views to be then presented, and let us be sure that we are relying on what we hear from official authoritative sources and rely on those entirely in our consideration and decision of this case. Let's forget all about what has been floating in the community. We are now to the serious business of ourselves determining what the facts really are, and we will get that from

this witness stand and on the basis of the rules of law that the Court will give you.

"Without any formality—does that cover what you wanted?

"Mr. Garmone [Defense counsel]: Yes.

"The Court: Does that cover what you wanted?

"Mr. Corrigan: Yes, that's what I wanted covered, your Honor. Thank you."

Abbreviated repetitions of this admonition were made throughout the trial whenever the jury recessed, usually in the form of the statement that they were to remember the court's admonition and refrain from discussing the case, even among themselves. We find no instances where defense counsel expressed dissatisfaction with the adequacy, style or frequency of the court's admonitions in this regard. Neither does present counsel point to any such insufficiency.[7] Protest was voiced only when the court refused to interrogate the jury as to the Considine broadcast discussed below, and when it refused the motions for mistrial.

 The District Court has here presumed prejudice from the publicity accorded Dr. Sheppard's trial. We believe that the presumption should be to the contrary, that the jury is assumed to have obeyed the instructions to avoid all contact with publicity concerning the case before them until some contrary showing has been made. E. g., Estes v. United States, 335 F.2d 609, 615 (CA 5, 1964), cert. denied, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965); United States v. Agueci, 310 F.2d 817, 99 A.L.R.2d 478 (CA 2, 1962), cert. denied, Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); Rizzo v. United States, 304 F.2d 810, 815 (CA 8, 1962), cert. denied sub nom. Nafie v. United States, 371 U.S. 890, 83 S.Ct. 188,

9 L.Ed.2d 123 (1962); Cohen v. United States, 297 F.2d 760, 764 (CA 9, 1962), cert. denied, 369 U.S. 865, 82 S.Ct. 1029, 8 L.Ed.2d 84 (1962); Holmes v. United States, 284 F.2d 716, 718, 97 A.L.R.2d 782 (CA 4, 1960). The rationale for this presumption was stated in somewhat different words by Mr. Justice Holmes more than a half-century ago: "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day." Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 6, 54 L.Ed. 1021, 1029 (1910).

 The presumption that obedient to instructions, the jurors ignored publicity during the trial has not been overcome by petitioner. The only showing that any of them encountered any of this publicity came when the trial judge questioned the jurors about a Winchell broadcast during the trial attributing marital infidelity to Dr. Sheppard. Two jurors advised that they had heard the broadcast, but would not be influenced by it, and an appropriate admonition on the subject was given by the judge. Defense counsel also requested interrogation of the jury as to their knowledge of another broadcast in which one Considine made remarks derogatory to Dr. Sheppard. The trial judge refused this request, observing that he did not think the jury should be harassed with interrogation each morning. We believe that this action was itself within the discretion of the judge, and that it may indeed have been the best thing to do. A discreet judge might well conclude that repetitive reference and inquiry as to matters prejudicial to the defense would harm rather than help. A substantial number of lawyers skilled in the art of advocacy would, we think, agree. Compare Estes v. United States, 335 F.2d 609, 615 (CA 5, 1964), cert. denied, 379 U.S.

7. The dissenting opinion in this case, however, now characterizes such admonitions as "equivocal and inadequate," and also as "infrequent and equivocal." It has not been pointed out to us that in any of the many attacks on the Sheppard conviction

have his able and aggressive counsel ever made such a charge. We are satisfied that the jury readily understood the judge's admonitions and that the dissent's charge of "equivocation" is not justified.

964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965); United States v. Provenzano, 334 F.2d 678, 696 (CA 3, 1964), cert. denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964); Ford v. United States, 233 F.2d 56, 61–62 (CA 5, 1956), cert. denied, 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53 (1956). In any event, any effect that this limitation of interrogation during trial might be thought to have is dissipated by the opportunity accorded defense counsel to interrogate jurors on their motion for a new trial. Three of the jurors were thus questioned, but counsel did not see fit to inquire into possible contacts with trial publicity.

On the basis of the record now before us, we can only guess whether the jurors violated the instructions to avoid publicity about the trial in any significant degree. In view of the presumption that such instructions were obeyed, we must hold that petitioner has failed to carry the burden of demonstrating a denial of due process in the trial publicity.

The District Judge also concluded that news coverage of the trial deprived petitioner of his constitutional rights because it contributed to a "carnival atmosphere." Stress is laid on the manner in which the trial judge allocated the seating available in his small courtroom, giving most of it to the press and installing special tables for them. Now, with the reflection and the hindsight that an interval of ten years has provided, and after all of the appellate tribunals have found the judge's conduct in this regard without constitutional fault, it is asserted that the trial judge should have done a better job. We are not told what alternative measures he should have adopted. Certainly he was without power to slake the public interest. Should he then have selected news representatives who would be regularly favored with admission to the courtroom, and let each day's trial begin with a scramble by the unfavored to gain access? Should he have moved the trial out of the courtroom into some public hall or auditorium where the public and the press could be accommodated at a greater distance from the jury and

counsel? Shall we now speculate whether such planning would have reduced or augmented the so-called "carnival atmosphere?" It is asserted also that too many photographs were taken of the jury, the defendant, and counsel. No photographs were allowed to be taken in the courtroom while the court was in session. In view of today's increasing dissatisfaction with the aggressive performance of many of the news media, it may indeed be regretted that the trial judge did not enforce more rigid discipline of its representatives. But we can no more find impropriety of constitutional magnitude in what occurred than could the other appellate courts that have been challenged to do so.

▮ The claim that the trial judge contributed to a "carnival atmosphere" is further supported by emphasis on the installation in the courtroom of a microphone and loud speakers. This is surprising in view of the fact that it has become regular practice to install such electronic equipment in modern courtrooms, including those occupied by the United States District Courts. We find no merit in this claim.

The opinion of the District Court additionally criticizes activities of the press as follows:

"The Court need not be naive, and it does not stretch its imagination to recognize that one of the purposes of photographing the jurors so often was to be assured that they would look for their photographs in the newspapers and thereby expose themselves to the prejudicial reporting. Also, the newspapers ran editorials praising the trial judge (he was a candidate for re-election) and published photographs and sketches of him in at least 46 separate issues. *This was certainly an attempt to bring him around to their way of thinking.*" 231 F.Supp. 63. (Emphasis supplied.)

Even if we were to join in the apparently gratuitous inference as to the press' motives, we have just examined the reasons why we cannot join in the presump-

tion that the jurors violated their oaths and instructions by examining the trial publicity.[8] Nor are we willing to assume the judicial venality or timidity we would have to assume to find any effect of such publicity on the judge in the face of a record which is entirely devoid of any evidence of trial misconduct on his part.

We ponder whether the flamboyant and sometimes shabby pretrial exhibitions of the press in this case would have had a greater tendency to predispose prospective jurors to an early suspicion of guilt of the accused than the news that a grand jury had indicted him followed by his arrest and being required to stand trial for murder. Are the procedures of our American courts, which we justly boast to be the fairest in the world, without power to seat an impartial jury notwithstanding its previous knowledge that an earlier jury of the accused's peers, a grand jury, had by its indictment accused him of murder? We do not think so.

More fundamentally, we are struck by the difficulty some ten years after the trial of indulging in the proposed speculation that had it been held in some other county in Ohio, the interest of the press, the radio and T.V. would have subsided, or that the citizens of some rural county would be less interested in the colorful events involved than their brothers in the big city. Was the interest in the long ago Scopes trial less because it was held in a rural area of Tennessee? Had the trial judge here decided to postpone the trial a month, six months, or a year, would not fresh and more colorful cries of righteous indignation be heard from all of today's media of information? Whither in time or place should a court run to attempt to seat a jury completely disinfected of all news, and at the same time intelligent? Compare Rees v. Peyton, 341 F.2d 859, 863 (CA 4, 1965); United States v. Cohn, 230 F.Supp. 589,

590–591 (S.D.N.Y.1964). Should a Federal Judge now speculate whether change of scene or postponement might have offered a way to administer some judicial catharsis to cleanse away all that prospective jurors might have seen, read, or heard about a matter of such interest as the killing of Mrs. Sheppard? We do not think that such speculative review of the trial judge's discretion should now be indulged in the context of this case.

Judge Blythin summed up his own estimate of the situation in the following language:

"We can't control publicity, and I do not believe that you will ever end the publicity in this case until you end the trial of this case, and I think perhaps it is our duty to put that business in reverse and proceed on a business-like, fair, honest, legal basis to try the case and have it disposed of in the interest of the State and certainly it is in the interest of Sam Sheppard to know whether a fair and impartial jury would declare him guilty or not guilty on the evidence which will be here produced. * * "

We hold that petitioner failed to meet his burden of proving that the pretrial and trial publicity discussed above denied him due process of law or its equal protection.

2) *Disqualification of trial judge.*

The District Judge held that petitioner's constitutional rights were violated because the trial judge failed to recuse himself *sua sponte* from presiding at the Sheppard trial. The basis of this conclusion was some pretrial remarks which Judge Blythin is alleged to have made, indicating his belief that Sheppard was guilty. As in the case of the alleged prejudice of the jury, partiality and bias of the trial judge have been *presumed* without any proof that the trial judge did or said anything in the conduct of the trial that could be attributed to or

8. The dissent mentions photographs taken of the home and family of juror Mancini while she was away at the trial. It should be noted that Mrs Mancini was an alternate juror, discharged before the start of the jury's deliberations. This picture taking enterprise, however, does portray the brashness of some of today's news photographers.

which demonstrated prejudice against the petitioner.

The material from which this finding was· made came to light after the instant petition for habeas corpus was filed. There was put in evidence a statement of a New York columnist, one Dorothy Kilgallen Kollmar, wherein she stated that at the beginning of the trial she was invited into the Chambers of Judge Blythin and there told of the judge's belief that petitioner was "guilty as hell. There is no question about it." The full account of this alleged and interesting interview is set out in the District Court's opinion, 231 F.Supp. 64–65.[9] No denial of this conduct was made because the only one who could have done so, Judge Blythin, had been long dead when he was thus accused. The District Judge seemed to believe that with Judge Blythin's voice stilled by death, this recitation of his statements became "uncontroverted evidence in this case and must be accepted as being true."

A similar charge was made against Judge Blythin by one Edward T. Murray, an employee in the office of the Clerk of the Common Pleas Court of Cuyahoga County at the time of the Sheppard trial. His statement was that during a discussion of the Sheppard case in July, 1954, prior to the trial, Judge Blythin remarked that "Sam Sheppard was as guilty as he was innocent." As in the case of the first discussed accusation, no corroboration or denial of the charge could be provided because the only identified witness to the occurrence, a lawyer by the name of Maher, had, like the accused judge, long since died and the accuser's memory failed him as to the identity of "three or four" other people present.[10]

▆▆▆▆ We believe that the District Judge was under a misapprehension in assuming that because Judge Blythin could not answer the charges against him, such charges constituted "uncontroverted evidence" that Judge Blythin had made the statements attributed to him. There are many circumstances in · which testimony need not be accepted even though formally uncontradicted. E. g., Quock Ting v. United States, 140 U.S. 417, 420–422, 11 S.Ct. 733, 35 L. Ed. 501, 502–503 (1891); Scates v. Isthmian Lines, Inc., 319 F.2d 798, 799 (CA 9, 1963); Ramos v. Matson Nav. Co., 316 F.2d 128, 132 (CA 9, 1963); D'Orsay Equip. Co. v. United States Rubber Co., 302 F.2d 777, 779–780 (CA 1, 1962); Powers v. Continental Cas. Co., 301 F.2d 386, 388–389 (CA 8, 1962); Wooley v. Great Atl. & Pac. Tea Co., 281 F.2d 78, 80 (CA 3, 1960); Hasson v. C. I. R., 239 F.2d 778, 782 (CA 6, 1956); Andrew Jergens Co. v. Conner, 125 F.2d 686, 689 (CA 6, 1942); Goodyear Tire & Rubber Co. v. FTC, 101 F.2d 620, 624 (CA 6, 1939), cert. denied, 308 U.S. 557, 60 S.Ct. 74, 84 L. Ed. 468 (1939); 8 Cyclopedia of Fed. Proc. § 26.98 (3d ed. 1951); 11 Id. § 47.161 (3d ed. 1963); 7 Wigmore, Evidence, § 2034, pp. 260–63 (3d ed. 1940). Manifold reasons for rejecting the "uncontroverted" statements adduced by petitioner exist in the present case. Whether offered to prove the matter asserted or merely the fact of assertion, testimony as to the uncorroborated oral statement of a deceased person is the weakest form of evidence, viewed with suspicion and subject to close scrutiny. "The courts consider with suspicion, or lend a reluctant ear to, statements as to what a deceased person may have said,

9. No explanation was offered to the District Court as to why disclosure of this unusual conduct of a judge of unimpeached reputation awaited his death. The accusation of the columnist was not made before the District Judge. It was contained in a statement agreed to have the "status of a deposition" and also, by agreement of counsel, no oath was administered "since the integrity of the witness is not in dispute." She was not cross-examined.

10. As in the case of Dorothy Kilgallen, Mr. Murray was not put under oath and gave no explanation of the long interval between the event and its disclosure. Neither did he explain why he could recall the identity of one witness, unavailable because of his death, but could not recollect the other witnesses who might be living and available.

especially when corroboration is lacking." 31A C.J.S. Evidence, § 266, p. 689. Such statements "are regarded as of comparatively little probative value. * * *" 20 Am.Jur. Evidence, § 1196, p. 1048, and "* * * courts of justice lend a very unwilling ear to statements of what dead men had said," Lea v. Polk County Copper Co., 62 U.S. (21 How.) 493, 504, 16 L.Ed. 203, 207 (1859). Whether the habeas corpus factfinder be persuaded by the polite language of the Ohio Attorney General that "even the best of memories wane dim to some extent," or cared to find inherently incredible the stories told by Judge Blythin's accusers or be satisfied that they did not overcome the presumption of the regularity of the deceased trial judge's conduct, he was at liberty to withhold his conviction of Judge Blythin in this regard. There is, moreover, much to contradict these "uncontroverted" statements, which are entirely inconsistent with several other remarks made by Judge Blythin. Thus, in denying renewed motions for change of venue or continuance, he stated that it would be in Dr. Sheppard's interest to have a verdict rendered upon the evidence offered in court, "and the court has no idea whatever what that evidence will be. He hasn't even a thought as to the direction of it. He is fortunate in that respect, and he is very pleased about this situation." Again, in cautioning the jurors before a weekend recess to avoid all publicity about the case, he said that by avoiding such publicity "you will feel very much better as the trial proceeds, I am sure, and I have no idea what is going to develop in the trial any more than you do. * * * It is serious business, of course * * * we ought to be equally serious as the matter itself, and we should be sure that we are keeping ourselves as good citizens in the position where we can listen to that testimony without being influenced in any way, shape or manner by what may be surrounding in the air and which may have no basis in fact."

During the course of the trial, Judge Blythin cut off repetitious examination by defense counsel, and during the course of the ensuing discussion stated that "the Court thinks and believes, thoroughly believes, that he has been impartial from the beginning, and he will be to the end. The Court has no interest in this case other than to be sure that we do have a fair trial and that we proceed with the trial." While overruling defense motions made at the close of the state's case, he made the following remarks:

> "Gentlemen, due to the tendency that always exists, among the laymen at least, to deem anything that the Court says about the evidence in a case, or about the remarks of counsel directed to that evidence, as some expression or at least suggestion that the Court has formed some opinion as to what the facts really are, of course, this case and in this connection at the moment the Court has no obligation whatever, nor even right, to even consider the weight of the facts in this case nor to express any opinion or, in fact, have any opinion as to the guilt or innocence of the defendant."

Perhaps most important, an affidavit by one of the original defense counsel filed in the present proceeding relates that when Judge Blythin was asked whether he would be influenced by the fact that his son had participated in investigating the crime, he stated that he would disqualify himself if defense counsel wished, and "he made himself very clear as to what his position was, and that he could sit and hear this case without having any prejudices." We find further evidence of his judicial discernment in Judge Blythin's valid defense of his court and himself in denying petitioner's motion for new trial,

> "It is to be noted that not a single person or agency connected with the investigation of, or prosecution for, the crime involved escapes the anathema of the defense. These include the police, the coroner, his assistants, the prosecuting attorney and his aides, the State's witnesses, the grand jury, its foreman, the trial

jury, the public, the bailiffs *and the Court.* The sense of search for truth and the declaration of justice seem to have vanished from a whole community as if by magic and overnight. The news agencies of every kind and character are thrown in for good measure. *In spite of all the charges made not a single specific item is cited in support of the claims made.* Only broad generalities are indulged in. Reviewing courts will, we hope, have the duty of passing on all the legal questions involved and appearing on the record, and unless it is shown in very clear fashion that some extrinsic forces plowed through the effort to grant the defendant a fair trial, and succeeded in disrupting that effort, it is fair to assume that none did." (Emphasis supplied.)

■ The accuracy of the quoted statements by Judge Blythin, permanently recorded when made, are not subject to fallible human memory as are the dead-man "admissions" furnished by Murray and Mrs. Dorothy Kilgallen Kollmar. Certainly a factfinder could give them weight in resolving the issue.

■ Despite the foregoing, however, we do not feel that we need here rule that the District Judge's finding of fact was clearly erroneous within Fed.R.Civ. P. 52(a). Accepting his finding that Judge Blythin in fact made the statements attributed to him, we are not persuaded that petitioner has met his burden of proving deprivation of his constitutional rights in this regard. Absent some proof that an early impression of petitioner's guilt so infected Judge Blythin's judicial disposition as to impair his ability to provide petitioner a fair trial, we cannot join in the holding of the District Court. We find no authoritative disagreement with the text that "a judge is not disqualified to sit in a criminal case merely because he has an opinion as to the guilt of the accused, or is convinced of his guilt. * * *" 30A Am.Jur. Judges, § 172, p. 89, and that "In the absence of prejudice or

bias, a judge is not disqualified by a declaration of his belief as to the guilt of a person charged with an offense before him. * * *" 48 C.J.S. Judges § 89, p. 1078. Compare Hendrix v. Hand, 312 F.2d 147 (CA 10, 1962); United States v. Shotwell Mfg. Co., 287 F.2d 667, 672 (CA 7, 1961), aff'd 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); United States v. Mroz, 136 F.2d 221, 224 n. 4 (CA 7, 1943), cert. dismissed, 320 U.S. 805, 64 S.Ct. 23, 88 L.Ed. 487 (1943).

The only authorities cited by the District Judge for his finding of constitutional error in the failure of the trial judge to recuse himself, State ex rel. Pratt v. Weygandt, Chief Justice, 164 Ohio St. 463, 132 N.E.2d 191 (1956); Tumey v. State of Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), are completely inapposite. In the case at bar it was the jury and not the judge who determined the guilt or innocence of petitioner. State ex rel. Pratt v. Weygandt was a divorce case to be decided entirely by the trial judge, and mandamus to compel his replacement was refused. McFadden v. United States, 63 F.2d 111 (CA 7, 1933), not cited by the court below, is also distinguishable as involving a trial to the judge without a jury. Similarly, in Tumey v. State of Ohio, the United States Supreme Court held improper state provisions for trial of liquor law violations before a village mayor who was to retain the amount of his costs in each case of conviction, in addition to his salary. The Court said, "But no fees or costs in such cases are paid him, except *by the defendant, if convicted.* There is, therefore, no way by which the mayor may be paid for his service as judge, *if he does not convict* those who are brought before him * * *." 273 U.S. 520, 47 S.Ct. 440, 71 L.Ed. 753. (Emphasis supplied.) The Court also noted that "[a]ll questions of judicial qualification may not involve constitutional validity. Thus matters of * * * personal bias * * seem generally to be matters merely of

legislative discretion." 273 U.S. 523, 47 S.Ct. 441, 71 L.Ed. 754. In re Murchison involved the Michigan "one-man grand jury" statute and the Supreme Court held that due process was denied where the judge presiding at a contempt hearing had also served as the "one-man grand jury" out of whose proceedings the contempt charges arose. The distinction between these cases and the case at bar is obvious.

It would come as no surprise to the legal profession and to an informed judiciary that there must be many times when a presiding judge exhibits impeccable fairness and discretion in his conduct of a criminal jury trial notwithstanding his own belief in the guilt of a defendant. What, for instance, of the position of the judge where a defendant withdraws a guilty plea? See United States v. Kravitz, 303 F.2d 700 (CA 3, 1962), cert. denied, 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962). Such fairness, indeed, is the mark of the kind of men we dare to think occupy judicial office. If no judge could preside at a criminal trial except one devoid of discernment, we would be hard put to find judges to handle our criminal dockets. We pridefully believe that by and large our judges are so conscious of their solemn duties as to protect meticulously the rights of an accused notwithstanding personal impressions of his guilt or innocence. Good judicial manners should of course suggest nondisclosure of such thoughts, but on the record before us we are unable to join in finding impropriety of constitutional magnitude. Certainly we cannot accept the District Judge's determination that such statements raise a presumption of constitutional unfairness and that having made such statements "the judge then has a personal interest in seeing

that the defendant is convicted or the judge may well be embarrassed for having made such an emphatic statement of guilt." 231 F.Supp. 65–66. Upon what weak foundations would rest the judgments of our courts if long after the event they could be set aside by attributing to a judge misconduct not discoverable in the trial record, in circumstances where death forecloses any answer by the accused judge.

Much has been made of the fact that the Sheppard trial began on the eve of a judicial election at which the trial judge and one of the prosecution staff were candidates. We must assume that this is emphasized to imply that desire for victory may have led the judge to conduct prejudicial to Dr. Sheppard's rights. We would have to entertain a low estimate of the integrity of our fellow judicial officers to join in any such inference. In most of the states of the Union it is traditional that those who occupy judicial office be required from time to time to account for their stewardship by submitting to election. If it is suggested that we presume that an elective judiciary can preserve constitutional rights only at some undefined distance in time from election day, we reject such suggestion out of hand. As realists we know that those who seek reelection to judicial office hope that their conduct will find public approval, but we do not think that judicial *misconduct* would be more attractive to the electorate than conduct marked by the integrity which we as judges like to believe is possessed by elected judges as well as those who have the security of tenure during "good behavior." Nor are we prepared to presume that any judge is so far enamored of his position as to betray its responsibilities, no matter what he thinks would

11. The dissenting opinion refers to what is termed a "TV camera interview" of Judge Blythin with a former Scotland Yard officer and a "television program conducted on the steps of the courthouse * * * where * * * the trial judge had appeared." The basis for these charges is an unposed news photograph showing Judge Blythin approaching the door to

the courthouse. The newspaper identification of the picture recited that the interview was being conducted "as Judge Edward Blythin breezed by." In denying the motion for new trial, Judge Blythin gave this account of the event:

"The court, on one morning, walked toward the courthouse steps, as usual, and there saw Robert Fabian (a retired Su-

most please the electorate.[11] Additionally, it is not inappropriate to note that much of the publicity complained of, and the actual taking of testimony at Dr. Sheppard's trial, occurred *after* the election had been held. For like reasons, we must reject Dr. Sheppard's repetition in this Court of his broadside charge "that the elective judges of Ohio were so biased and prejudiced against him that he could not expect fair adjudication of his case in state courts. * * *"

3) *Lie detector evidence.*

■■■■■ Bay Village Mayor Houk, witness for the state, buttressed his veracity, over defense objection, by disclosing that he had submitted to a lie detector test. He was not allowed to give the results of the test. This was found not to have been reversible error by the Ohio appellate courts. State v. Sheppard, supra, 100 Ohio App. 345, 388, 128 N.E. 2d 471, aff'd, State v. Sheppard, 165 Ohio St. 293, 135 N.E.2d 340. We are satisfied that no due process question is presented by this subject. Details of the Houk testimony are set forth in the District Court opinion wherein the District Judge indicates that, standing alone, the Houk affair might not be of constitutional stature.

In the pretrial press accounts, reference was frequently made to Dr. Sheppard's refusal to take a lie detector test. These same accounts also reported that he initially explained that his unwillingness to submit to the test arose from his then overwrought emotional state. He later assigned his continued refusal to the advice of his counsel and his family. Upon trial, two police officers gave evidence of his refusal to take the test.

No objection was made to the testimony of the first officer, and the lie detector question was discussed thoroughly on direct, cross, redirect, and recross examinations. Nor was there any objection when the second officer first referred to Dr. Sheppard's refusal to submit to such testing. The context of the first objection made—and the charge of constitutional error by the trial judge—is found in the following continuation of the second officer's account of Dr. Sheppard's voluntary communications to the police, which were made in the presence of his counsel. We have partially reduced this excerpt to narrative form.

When that tour was completed . . we had some conversation with Dr. Sam and Mr. Petersilge and Mr. Corrigan. . . . I asked him if he could come into the office and make a statement in writing telling us the facts about the night of July 3rd. And it was agreed that I was to be called on the telephone nine o'clock Saturday morning, July 10th. Mr. Corrigan said he would call me about 9 a. m. . . . At about 8:20 or 8:25 A.M., July 10th Dr. Stephen Sheppard, Dr. Samuel Sheppard and Mr. Petersilge came into our office. He said he was prepared to make a statement. Then after being interviewed for an hour and a half, he was taken into our office on the fourth floor where he made a statement, which was typed. That statement has been offered into the evidence. State's Exhibit No. 48 is the statement that the defendant made at our office on the 10th. After the defendant made this statement in writing, the next time that I saw

---

perintendent of Scotland Yard) with a very small contraption in his hand. Mr. Fabian said, 'Good morning, Judge Blythin, nice morning.' The court said 'Good morning, Mr. Fabian.' These are the very words, as near as the court can remember them, that passed. There was no conversation of any kind about the case on trial or any other subject."

The dissent also refers to a news photograph which is characterized as showing Judge Blythin "holding a press confer-

ence" during the jury's deliberations. However, this event is identified by the Cleveland Plain Dealer as follows: "Cornered by reporters, Common Pleas Judge Edward Blythin announced he was going to let the Sheppard murder jury continue to deliberate despite the record-breaking period it has been out."

We are unable to convict Judge Blythin of witting or unwitting misconduct from these events.

him was on July 12th. I saw him at his home, and spoke with him. Mr. Corrigan, Mr. Petersilge [Sheppard's counsel] his brother, Dr. Richard and Dr. Stephen were present. I again asked him if he had thought over the suggestion that .I made that he try to eliminate himself as a suspect. He stated that he wanted to help us in every way possible to serve this crime—solve this crime. I asked him "Why don't you meet me some morning at some designated place at a designated time unbeknownst to anyone but yourself and myself and we will take this lie detector test, and at least you will eliminate yourself in one way?"

"Q. Now, did you state to him as to where this test would be made?

"A. I said anywhere, regardless of where it might be, I would take him wherever he wanted to go.

"Q. And what did he say to that?

"Mr. Petersilge: Objection, your Honor. Now, the prosecutor keeps asking about whether Dr. Sheppard was willing to take a lie test, a lie detector test, and the Court of Appeals of this county has held that the results of a lie detector test are not admissible in evidence. It follows from that that it makes no difference whether Dr. Sheppard said that he would take the test or whether he refused to take the test.

"The Court: Well, he has answered the question. The Court will instruct the jury on the matter.

"Mr. Petersilge: Exception.

"Q. What did he say?

"A. He says, 'No,' he says, 'I'll be guided by the advice of my family and my attorneys."

"The Court: Mr. Parrino, the Court would like to say a word to the jury now. Ladies and gentlemen of the jury, you are not to understand by these questions that any person is obligated to take any lie detector test. A person has his own

choice. He is under no obligation whatever to take it. All right.

 * * * * * *

"Mr. Petersilge: Just a moment. If the Court please, we request the Court also to advise the jury that he not only has an option whether he will take it or not, but that the results of that test are not admissible in evidence.

"The Court: Well, they are not here, anyway, Mr. Petersilge.

"Mr. Mahon: We haven't any results here.

"The Court: They are not here.

"Mr. Mahon: We are not offering any results.

"Mr. Petersilge: That's right, but the reasons should also be stated to the jury.

"The Court: I know, but we need not go beyond what we have in evidence. The evidence is here that he was asked to take it, he refused. Now, the Court tells the jury that he doesn't have to take it, period. We will stop right there.

"Q. Was there any further conversation there on the 12th?

"A. I said, 'Will you give me an answer on that in the very near future?' He says, 'I'll act only upon the advice of my family and my attorneys.'"

The statement, Exhibit 48, was Sheppard's voluntary exculpatory statement and his answers to the officer's suggestion of a lie detector test were given voluntarily in the presence of his attorneys. Despite the above objection, Dr. Sheppard when testifying in his own behalf on direct examination by his counsel, told about the first request that he submit to a lie detector test and stated that he told the officers he would be willing to submit to such examination "if it was a reliable test." The subject was alluded to by the prosecution and the defense in the closing arguments, again without objection.

Neither the District Judge nor counsel point to any decisions ruling unconstitutional the admission of testimony that a

criminal defendant has refused to submit to a lie detector test. Authority for any such ruling must, we believe, be found in radiations from the Fifth Amendment, newly made applicable to state court proceedings by the decision in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Cf. United States ex rel. Shott v. Tehan, 337 F.2d 990 (CA 6, 1964); Schiers v. People of State of California, 333 F.2d 173, 176–177 (CA 9, 1964); Helton v. United States, 221 F.2d 338, 341 (CA 5, 1955); Mezzatesta v. Anderson, 227 F.Supp. 267, 271 (D.Del.1964). For this reason, we believe it appropriate to note also that defense counsel questioned Dr. Sheppard on his failure to invoke the privilege against self-incrimination at the coroner's inquest, and mentioned this failure in both opening and closing arguments to the jury.

The conduct of defense counsel regarding lie detector testimony has been discussed at length because we believe it spares us the need of determining the precise constitutional question suggested by the opinion of the District Court. Whatever the rule may be when prompt and appropriate objection is made, it is not a denial of due process for a trial court to withhold supervision of a seemingly deliberate withholding of objections by defense counsel or to allow a tardy change of strategy. It is significant that no motion to strike the extensive pre-objection testimony on this subject was ever made, that no written instruction on the subject was proffered at any time, and that no error was assigned on appeal because of what occurred in this regard. We think it would be a quite justifiable inference that for reasons sufficient to themselves, Dr. Sheppard's able and experienced trial counsel deliberately made an initial decision not to object to this evidence. We need not at this time try to probe the minds of such counsel to speculate as to what prompted their trial strategy. The passage quoted above demonstrates that they were aware of the rule rendering the results of lie detector tests inadmissible, and in their earlier objections to Mayor Houk's testimony they showed their awareness of the normal rule against testimony as to whether such a test has been taken. Ohio follows these rules, State v. Smith, 113 Ohio App. 461, 178 N.E.2d 605 (1960). Sophisticated trial counsel will readily recall many occasions when they have deliberately withheld objection to inadmissible evidence and thereby served their client well. Varying reasons motivate such strategy. In this case, counsel may well have desired to obtain from the mouths of police officers the many exculpatory statements made by Dr. Sheppard during the course of the investigation, particularly his original willingness to be tested by a lie detector, and to that end exhibited an attitude of willingness to let the officers talk. Their decision at long last to object to a particular answer which they then thought damaging to their theory that police hostility prompted the refusal did not shut out what had already been said on the subject. We agree that the trial judge could and should have given a better instruction to the jury, telling them that the results of a lie detector test would not be admissible and, *even though not requested to do so*, might well have gone further to say that no inference should be drawn from an accused's refusal to submit to such a test. His advice to the jury that they were "not to understand by these questions that any person is obligated to take any lie detector test. A person has his own choice. He is under no obligation whatever to take it," was, indeed, less than perfect. However, except for the on-the-spot request to tell the jury that "the results [of] that test are not admissible," no other instruction was requested, and the court did emphasize that no results of any test were available. We cannot find that the handling of this matter deprived the petitioner of any federally granted constitutional rights. If there was fault in what occurred, it was a nonconstitutional error which should have been assigned on appeal. Habeas corpus is not to be employed as a substitute for appeal. E. g., Oyler v. Taylor,

338 F.2d 260, 262 & n. 3 (CA 10, 1964); Allen v. Bannan, 332 F.2d 399, 402 (CA 6, 1964); Barker v. State of Ohio, 328 F.2d 582, 584–585 (CA 6, 1964); Worth v. People of State of Michigan, 291 F.2d 621, 622 (CA 6, 1961), cert. denied, 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59 (1961); Anderson v. Jones, 281 F.2d 684, 686 (CA 6, 1960).

We think that the observations of the Seventh Circuit in United States ex rel. Townsend v. Ogilvie, 334 F.2d 837, 843–844 (1964) are pertinent here.

"The [federal] court does not possess a residuum of power to search the record for procedural errors not involving constitutional rights and issue a writ of habeas corpus for the purpose of providing a new trial in the state court.

"A federal court acting in this fashion would constitute a super appellate tribunal and encroach upon state appellate court prerogatives; such action would affront the principles of federalism upon which our federal-state juridic system operates."

At this distance, we cannot say that the decision of Dr. Sheppard's veteran counsel to withhold objection to the lie detector evidence prejudiced their client. It goes without saying that Dr. Sheppard's conviction does not prove such.

As proud as we are of the great traditions of our courts and their concern for the rights of those accused of crime we are aware that like all human institutions they seldom act with perfection. It is not difficult, after ten years of searching analysis and contemplative study and the announcement of some new judicial attitudes, to find some imperfections in the conduct of a trial and to conclude that a judge or any attorney could have done a better job. But stability of the law and a nation's respect for its courts will disappear if, long after the event, their judgment may be set aside because a trial judge's discretion was less than perfectly exercised or because it is thought that the trial plan of defense counsel was not the best that could have been employed. This must be especially true where an accused has enjoyed adequate and full opportunities for appellate review.

4) *Misconduct of bailiffs in allowing Jurors to call their families.*

Ohio has a statute which provides for keeping a jury together from the time the cause is finally submitted until they agree upon a verdict. Overnight separation is permitted during adjournments of their deliberation. Ohio Revised Code § 2945.33 further provides that the officer in charge of the jury "shall not permit a communication to be made to them." As noted above, the Sheppard jury was not sequestered until the case was finally submitted. At that time, an entire floor of a hotel was set aside for occupancy by the jurors and the officers in charge of them. The telephones in each of the rooms occupied by the jurors were disconnected, but telephones in the officers' rooms remained in service. The stipulation of facts in the habeas corpus proceeding recites that during the days of their sequestration, but obviously not while they were actually engaged in their deliberations, various members of the jury were permitted to use the telephones in the bailiffs' rooms.

"The calls were placed by the jurors. No records were kept as to the numbers called, the parties called, talked with, or the calling jurors. The bailiffs sat next to the phone as the conversations took place, but could only hear that half of the conversation made by the juror; what was said *to* the jurors could not be heard by the bailiffs. The Court was never asked for permission to allow the jurors to make these calls, and no permission was ever given."

While the District Court's opinion recites the foregoing stipulation, there was also before it the entire record of the Common Pleas Court, including the hearing on petitioner's motion for new trial and the investigation then made of the telephone calls. Not mentioned by the District Judge or by the dissenting opin-

ion is the testimony of bailiff Francis, taken at the hearing on the motion for new trial, as follows:

"Q. Do you know, of your own knowledge, whether there was any telephone communications made out of any of the respective rooms that were occupied by any members of the jury?

"A. Their phones were cut out, Mr. Garmone.

"Q. And were there any telephone calls made from the room that you occupied?

"A. Yes, sir.

"Q. Did you make the calls, or did the jury make the calls?

"A. No. The jury made the calls, and I sat in the chair right alongside the telephone.

\* \* \* \* \* \*

"Q. Mr. Bailiff, what was the purpose of the calls that the jurors made in your presence?

\* \* \* \* \* \*

"A. Well, they were made to their husbands and wives, and those that had children, they talked to the children.

"Q. Was there any conversation whatsoever about this case or their deliberations?

"A. Not one word, Mr. Parrino."

The calls of the jurors were made the subject of an assignment of error on appeal, but the Supreme Court of Ohio refused to find cause for reversal in what happened. State v. Sheppard, 165 Ohio St. 293, 298–299, 135 N.E.2d 340, 345. Upon this subject the court said:

"In situations such as those in the Adams and Emmert cases, it is easy to presume prejudice to the defendant as a result of the conduct of the bailiff. Can the same be said of the conduct of the bailiffs here in permitting jurors, who for several days and nights had been sequestered and unable to see or hear from their husbands, wives or children, to telephone those members of their families? We do not think so. There is, on the contrary, every reason to believe that assurances of the health and welfare of their loved ones would tend to ease the jurors' minds as to personal matters and would make them better, more conscientious jurors. Time after time, the members of this jury were instructed by the court not to communicate with anyone concerning this case or permit anyone to communicate with them about it. We must assume they followed the court's instructions. No complaint is made that they disregarded these instructions every night for some seven weeks that they were allowed to go home at the close of each day's session of the trial. It is difficult to visualize a juror who will follow a court's instruction during the many hours he spends each evening and week end with his family and then deliberately disregard that instruction in a few brief moments he speaks to a member of his family on the telephone in the presence of a bailiff.

"The law of Ohio is that no judgment of conviction shall be reversed in any court for any cause unless it appears affirmatively from the record that the defendant was prejudiced thereby or was prevented from having a fair trial. Section 2945.83, Revised Code. There is no such affirmative showing of prejudice here, and this court will not presume a prejudice as a matter of law from the fact that some of the jurors made telephone calls to members of their immediate families."

The foregoing is not only the law of Ohio on this question but, in our view, is just plain common sense. Here again the District Judge placed reliance on cases the facts of which disclose their lack of resemblance to the case before him and us. State v. Adams, 141 Ohio St. 423, 48 N.E.2d 861, 146 A.L.R. 509 (1943); Emmert v. State, 127 Ohio St.

235, 187 N.E. 862, 90 A.L.R. 242 (1933); and Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). In State v. Adams, a bailiff who had been told by the jury that it could not agree said to them, "[y]ou can't do that. You must reach a decision if you have to stay here for three months." In Emmert v. State, the officer in charge of the jury remarked to certain jurors, "My God, you are all wet. Judge Stahl expects you to return a verdict of guilty and if you don't it will be just too bad." Aside from this obvious inappositeness,

these Ohio cases were found not controlling of this case by the Ohio Court. Mattox v. United States involved direct review of a federal trial. Because the dissenting opinion frequently cites Mattox to support its conclusions, we have set out in the margin Chief Justice Fuller's recital of the facts in Mattox [12] because it discloses a situation totally different from the facts of the present case. There the trial court refused to consider specific affidavits by jurors establishing highly prejudicial communications. Here defense counsel actually questioned three of

---

**12.** "In support of his motion for new trial, the defendant offered the affidavits of two of the jurors that the bailiff who had charge of the jury in the case after the cause had been heard and submitted, 'and while they were deliberating of their verdict,' 'in the presence and hearing of the jurors or a part of them, speaking of the case, said: "After you fellows get through with this case it will be tried again down there. Thompson has poison in a bottle that them fellows tried to give him." And at another time, in the presence and hearing of said jury or a part of them, referring to the defendant, Clyde Mattox, said: "This is the third fellow he has killed." ' The affidavit of another juror to the same effect, in respect of the remark of the bailiff as to Thompson, was also offered, and, in addition, the affidavits of eight of the jurors, including the three just mentioned, 'that after said cause had been submitted to the jury, and while the jury were deliberating of their verdict, and before they had agreed upon a verdict in the case, a certain newspaper printed and published in the city of Wichita, Kan., known as The Wichita Daily Eagle, of the date of Thursday morning, October 8, 1891, was introduced into the jury room; that said paper contained a comment upon the case under consideration by said jury, and that said comment upon said case so under consideration by said jury was read to the jury in their presence and hearing; that the comment so read to said jury is found upon the fifth page of said paper, and in the third column of said page, and is as follows:

" ' "The Mattox case—The jury retired at noon yesterday and is still out.

" ' "The destiny of Clyde Mattox is now in the hands of the twelve citizens of Kansas composing the jury in this case. If he is not found guilty of murder he will be a lucky man, for the evidence against him was very strong, or, at least, appeared to be to an outsider. The case was given to the jury at noon yesterday, and it was expected that their deliberations would not last an hour before they would return a verdict. The hour passed, and nine more of them with it, and still a verdict was not reached by 10:30 last night, when the jury adjourned and went to their rooms at the Carey. Col. Johnson, of Oklahoma City, defended him, and made an excellent speech in his behalf to the jury. Mr. Ady also made a fine speech, and one that was full of argument and replete with the details of the crime committed, as gathered from the statements of witnesses. The lawyers who were present and the court officers also agree that it was one of the best and most logical speeches Mr. Ady ever made in this court. It was so strong that the friends of Mattox gave up all hope of any result but conviction. Judge Riner's instructions to the jury were very clear and impartial, and required nearly half an hour for him to read them. When the jury filed out, Mattox seemed to be the most unconcerned man in the room. His mother was very pale, and her face indicated that she had but very little hope. She is certainly deserving of a good deal of credit, for she has stuck by her son, as only a mother can, through all his trials and difficulties, and this is not the first one by any means, for Clyde has been tried for his life once before. He is a youthful looking man of light build, a beardless face, and a nervous disposition. The crime for which he has just been tried is the killing of a colored man in Oklahoma City over two years ago. Nobody saw him do the killing, and the evidence against him is purely circumstantial, but very strong, it is claimed by those who heard all the testimony." ' " 146 U.S. 142–144, 13 S.Ct. 51, 36 L.Ed. 918–919.

the jurors on their motion for new trial, but no attempt was made to discover anything about the telephone calls, and no attempt was made to call the other jurors for such examination. Neglect of this opportunity to prove actual prejudice might itself be reason enough to deny relief in the absence of any present showing of actual prejudice, compare United States v. Gersh, 328 F.2d 460 (CA 2, 1964), cert. denied sub nom. Mugnola v. United States, 377 U.S. 992, 84 S.Ct. 1919, 12 L.Ed.2d 1045 (1964). Going beyond this possibility, it is worthy of note that even on direct review of federal convictions where improper communications have been had with a juror, "it is well settled that what is prejudicial to a fair trial when the issue of 'juror misconduct' is raised, is a matter that must, to a large extent, be left to the discretion of a trial court and that an appellate court will not reverse the determination of that court on such an issue unless it is established as clearly erroneous." Little v. United States, 331 F.2d 287, 295 (CA 8, 1964), cert. denied, 379 U.S. 834, 85 S.Ct. 68, 13 L.Ed.2d 42 (1964). Several other cases establish that communications with jurors, even during their deliberations, do not necessarily void their verdict. E. g., United States v. Kahaner, 317 F.2d 459, 482–483 (CA 2, 1963), cert. denied, Corallo v. United States, 375 U.S. 835, 836, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963); Steiner v. United States, 229 F.2d 745, 748–749 (CA 9, 1956), cert. denied, Pursselley v. United States, 351 U.S. 953, 76 S.Ct. 845, 100 L.Ed. 1476 (1956); Ryan v. United States, 89 U.S.App.D.C. 328, 191 F.2d 779 (1951), cert. denied, Duncan v. United States, 342 U.S. 928, 72 S.Ct. 368, 96 L.Ed. 691 (1952); Cavness v. United States, 187 F.2d 719, 723 (CA 9, 1951), cert. denied, 341 U.S. 951, 71 S.Ct. 1019, 95 L.Ed. 1374 (1951). The showing that communications were had with the jurors, accordingly, is not of itself enough to demonstrate a denial of due process. So in Near v. Cunningham, 313 F.2d 929, 933 (CA 4, 1963), the court ruled that "[s]hould it appear that prejudicial statements were made in the presence or hearing of the jurors," the habeas corpus court must reach its constitutional decision "in the light of all of the surrounding circumstances." Here there is no pretense at showing that prejudicial statements were made to the jurors by their children or spouses. The presumption that the jurors remained true to their instructions is fortified by petitioner's neglect of his opportunity to show that the jurors chose this particular opportunity among many to violate their instructions. In view of the absence of any attempt to demonstrate or even claim such violations here, we are satisfied that the Ohio Supreme Court correctly disposed of this issue, and that in any event the occurrence does not present a denial of constitutional due process.

The Supreme Court's recent decision in Turner v. State of Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) does not affect decision of this question. The Court was there dealing with a conviction following three days' "continuous and intimate association" between the jury and two key witnesses for the prosecution, who were also deputy sheriffs. Dispensing with the requirement that *improper* communications be shown in such a situation cannot be related to the present situation, where we are shown only that some members of the jury made brief telephone calls to members of their families with whom they had, quite properly, been in continuous association throughout the trial.

5) *Other questions.*

Each of the "errors" discussed above was found by the District Judge to constitute a deprivation of due process, but he concluded his opinion with the observation that when taken together they reduced the trial to a "mockery of justice." Without further discussion, we are unable to attribute to a combination of these several claims a constitutional potency they lack individually. We have rejected the claims based on publicity, alleged bias of the trial judge, and communications with the jurors because no

showing has been made that anything improper in fact occurred; we are no more willing to presume infirmity when these claims and the matter of the lie detector evidence are listed together than when they are considered separately.

Petitioner's brief to this court suggests that if we find the reasons given by the District Judge insufficient for granting the writ "such action would require a remand for further factual determination of the remaining points." Counsel urges, in the alternative, that we pass upon these remaining points not relied on by the District Judge, and as to them petitioner "will stand upon the argument addressed to them in the Brief for Petitioner in the District Court." Without passing upon the procedural propriety of these suggestions, we consider that the case made in the District Court is before us and we have considered and found without merit the other claims of constitutional vice in the judgment convicting Dr. Sheppard.

One further subject should be briefly mentioned. Dr. Sheppard's petition claimed that the evidence at his trial was constitutionally insufficient to justify submitting the issue of guilt or innocence to the jury. This claim was neither withdrawn nor sustained upon the hearing in the District Court. On this subject, the petitioner's brief states,

> "The District Judge expressly declined to consider this issue * * *, although in all fairness it should be stated that counsel for petitioner-appellee on several occasions offered to waive this claim of error. * * * No waiver was required, however, *and the issue remains*. This Court no doubt has the power, since the trial transcript is before it as an exhibit from the District Court, to search the record and conclude that the allegation of insufficiency is well-taken." (Emphasis supplied.)

We construe this as a suggestion that we pass upon this point only if we find

in his favor. Counsel continues as follows:

> "Appellee neither asks nor urges such relief, for he is ready, willing and anxious to stand retrial in any community not infected with an envenomed atmosphere, and a favorable ruling upon this issue would cause jeopardy to attach to the 1954 trial. This is not, however, to be taken as any concession that there was sufficient evidence to constitutionally support a judgment of conviction in the first instance, for we vigorously contend that there was not. We simply do not press it at this time."

The Court of Appeals decision, affirmed by the Ohio Supreme Court, fully discussed the evidence and found it sufficient for submitting the issue of guilt to the jury. 100 Ohio App. 345, 128 N.E.2d 471. No claim is made here that that court's detailed recital of the evidence adduced at the trial is substantially erroneous. Without attempting to assess petitioner's actual guilt or innocence, this recital clearly establishes that Dr. Sheppard's conviction is not "so totally devoid of evidentiary support" as to constitute a denial of due process. Garner v. State of Louisiana, 368 U.S. 157, 163, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961); Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); Hall v. Crouse, 339 F.2d 316 (CA 10, 1964).

Petitioner apparently desires to save something for a further entry into or a rehearing in the District Court. We think that Ohio's appeal has brought the entire habeas corpus proceeding to us. We have passed upon it and do not find any basis for the release of Dr. Sheppard or the granting of a new trial.

*Conclusion.*

There is today no uncertainty that it is proper and, indeed, obligatory that Federal Courts see to it that no state shall convict or imprison anyone without that due process of law which the United States Constitution demands. This duty

must be discharged, even at the risk of appearing arrogant in setting aside a judgment approved by all the courts of a particular state. In the context of the case before us, however, we will not be considered delinquent if we give proper respect to the carefully considered decisions of the Ohio courts and attribute to those courts power to discern and protect the constitutional rights of an accused at least approaching our own. Certainly the District Judge who heard this case gave to its study the labor, the conscientiousness, and the commendable concern for the accused's constitutional rights which we like to think are typical of our Federal judiciary. We fear, however, that this admirable zeal led him to go beyond permissible limits to find constitutional fault in what was done by the Ohio courts. The facts of this case do not add up to any of the situations in which the Supreme Court of the United States or any United States Court of Appeals has found it appropriate to strike down a judgment affirmed by the highest court of a state.

The order and judgment of the District Court is reversed with direction to discharge the writ and remand the petitioner to the custody of the respondent.

EDWARDS, Circuit Judge (dissenting).

If ever flagrant and tolerated interference of news media in a criminal trial served to deprive a defendant of his constitutional rights to due process and a fair trial, this surely must be such a case.

The United States District Judge whose writ of habeas corpus we review declared this trial void and ordered the State of Ohio either to retry petitioner or set him free. By so doing, Judge Weinman did no more than fulfill his sworn obligation to uphold the Constitution of the United States. I would affirm.

The record which we review discloses a trial which fell far below minimum fed-eral constitutional standards of due process.

The fundamental concept of a jury trial requires the protection of the jury from extra-judicial information about the case.[1] This doubtless can never be perfectly achieved in a trial of great public interest because of pre-trial publicity.[2] But this fact serves as no excuse for failure to employ all of the known and established measures for selection of an impartial jury and for the protection of that jury from outside influences during the trial itself.

This trial was held in a murder-shocked community in close proximity to the date of the crime in the midst of "unparalleled" publicity. (See State v. Sheppard, 165 Ohio St. 293, 294, 135 N.E. 2d 340 (1956)) During the nine weeks of trial this jury was allowed to separate each night and weekend to their individual neighborhoods and homes. Such admonitions as the trial judge gave pertaining to news media during the first month of testimony were equivocal and inadequate.

During this trial there were constant extra-judicial contacts and communications with this jury. Many of these extra-judicial contacts and communications with the jury are clearly established by the record. As to others, Judge Weinman found that jury knowledge should be implied because of a factual record which impels me to the same conclusion.

A number of the most important and most prejudicial of the news media communications were drawn from sources completely outside of the trial record. These were not just news media inaccuracies or debatable comments in reporting court proceedings, they represented deliberate and highly prejudicial supplementation of the trial record.

Elaborate measures were provided for news media convenience in covering the trial. But the standard measures which

1. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892).

2. Irvin v. Dowd, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

could have been employed to prevent the news media from influencing the outcome of trial were not employed. In a trial atmosphere which the Supreme Court of Ohio described as "a Roman Holiday for the press," the news media were frequently allowed to become the dominant factor in a courtroom where defendant was on trial for his life. The judge who presided at this trial repeatedly professed his inability to control these events. In fairness it should be noted that he was in the most difficult and vulnerable position possible to undertake to do so.

But at the outset it should be stated that it was not just abuse of freedom of the press which accounted for the violations of due process in this trial; it was failure of the judicial process also. This case provides no argument for repeal of the First Amendment or for immunization from prosecution of any person indicted for crime.

A judge assigned to try a controversial criminal case in the midst of great public excitement has the duty to guarantee due process of law. He also has the power to do so. Seven principal measures are available to him to protect the right to a fair trial of a person charged with crime.

1) On defendant's motion he can grant a change of venue to a distant locale in his same state which is less concerned with the crime. Ohio Rev.Code Ann. § 2311.38; Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Irvin v. Dowd, supra.

2) He can adjourn the trial, at least briefly, until a peak of public excitement (or a judicial election!) has passed. Ohio Rev.Code Ann. § 2945.02; Rizzo v. United States, 304 F.2d 810 (CA 8, 1962), cert. denied, Nafie v. United States, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962).

3) He can lock up the jury during trial so that it is guarded from outside contact. Ohio Rev.Code Ann. § 2945.31; United States v. Holovachka, 314 F.2d 345 (CA 7, 1963), cert. denied, 374 U.S. 809, 83 S.Ct. 1695, 10 L.Ed.2d 1033 (1963); Baker v. Hudspeth, 129 F.2d 779, (CA 10, 1942), cert. denied, Baker v. Hunter, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942); Stone v. United States, 113 F.2d 70 (CA 6, 1940).

4) Absent these precautions he has increased responsibilities in screening the jury from extra-judicial influences. See Turner v. State of Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965).

He has the duty to prohibit news media contact with the jury. Mattox v. United States, supra. He has the power to exclude photographers from his courtroom. Canon 35, American Bar Association, Canons of Judicial Ethics.[3] He has the power to warn the news media that if communications prejudicial to either side in the trial and not derived from in-court testimony are widely disseminated, that this may cause a mistrial. See United States v. Accardo, 298 F.2d 133 (CA 7, 1962).

5) He has the duty to *order* the jury not to read or listen to any newspaper,

---

3. "35. *Improper Publicizing of Court Proceedings.**

"Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the court room, during sessions of the court or recesses between sessions, and the broadcasting or televising of court proceedings detract from the essential dignity of proceedings, distract participants and witnesses in giving testimony, and create misconceptions with respect thereto in the mind of the public and should not be permitted.

"Provided that this restriction shall not apply to the broadcasting or televising, under the supervision of the court, of such portions of naturalization proceedings (other than the interrogation of applicants) as are designed and carried out exclusively as a ceremony for the purpose of publicly demonstrating in an impressive manner the essential dignity and the serious nature of naturalization."

* Adopted September 30, 1937; amended September 15, 1952, and February 5, 1963.

radio or television material bearing on the trial. Coppedge v. United States, 106 U.S.App.D.C. 275, 272 F.2d 504 (1959); Schoeneman v. United States, 115 U.S. App.D.C. 110, 317 F.2d 173 (1963); Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608 (1958).

6) He has the duty if it is called to his attention that highly prejudicial material is widely disseminated in the open community wherein a jury is living at home, to inquire as to whether the jury has actually heard or read it; and if so, to determine whether prejudice resulted; and if so, to grant a new trial. Krogmann v. United States, 225 F.2d 220 (CA 6, 1955); Marson v. United States, 203 F.2d 904 (C.A. 6, 1953).

7) He has the duty to be particularly alert to guard the jury against any outside communication during its deliberations or verdict, and if unauthorized communications are shown, prejudice is presumed, and absent effective rebuttal of such prejudice, he has the duty to grant a new trial. Mattox v. United States, supra; Little v. United States, 73 F.2d 861, 96 A.L.R. 889 (CA 10, 1934); Wheaton v. United States, 133 F.2d 522 (CA 8, 1943). See also Ohio Rev.Code Ann. § 2945.33; State v. Adams, 141 Ohio St. 423, 48 N.E.2d 861, 146 A.L.R. 509 (1943).

In this case it must be recorded that the trial judge made no effective use of any of these measures.

### BACKGROUND FACTS [4]

What follows are the stark and undisputed facts shown by this total record—omitting for the moment the legal arguments pertaining to how and whether each possible issue has been properly raised, and omitting also the five trial events upon which I would affirm issuance of this writ.

This was a capital case.

Defendant was charged with first degree murder for the killing of his wife.

Defendant and his wife were last seen in their home about midnight, July 3, 1954, after a normal social evening.

Defendant first reported the murder at 6 a. m., July 4, 1954, asserting that he had been awakened by his wife's screams and had fought with and been knocked out by "an intruder."

The wife had been brutally murdered by 35 blows with an unidentified weapon.

Defendant bore visible signs of physical injury and there was medical evidence as to injury to his neck and head.

Defendant's account of the events had a vagueness about important matters which he attributed to the injuries and from which the prosecution later inferred guilt.

Defendant clearly had the opportunity to murder his wife on the night in question. No other suspect of apparent significance appeared in the case.

But the normal evidence of murder—identification, confession, motive, and murder weapon—was completely lacking at the beginning of the investigation.

As a result of the paucity of obvious proofs, there was no immediate arrest.

A newspaper campaign for a solution to the crime began and was pushed with incessant vigor by Cleveland's three newspapers—but in particular by The Cleveland Press.

There was widespread publicity given to a police suggestion that defendant take a lie detector test and to his refusal to do so.

Although publicly there had been no apparent cloud on the domestic horizon of the Sheppard family prior to the murder, The Cleveland Press disclosed an extra-

---

4. This summary is drawn from a) the stipulated statement of facts presented to the United States District Judge and printed herewith as Appendix A. b) The transcript of the original trial (12 volumes and 7,099 pages) which was stipulated as an exhibit before the District Judge. c) Five scrapbooks of newspaper clippings which were likewise stipulated to as an exhibit before the District Judge.

marital romance which defendant had with a former laboratory technician at the hospital with which he was affiliated.

The Cleveland Press in front page headlines, editorial and cartoons berated official slowness, demanded an inquest, condemned the "protection" of "the chief suspect," demanded the entrance of the Cleveland Police Department into the investigation, and demanded the arrest and the "grilling" of defendant at police headquarters.

The inquest, the investigation by the Cleveland Police Homicide Unit, and defendant's arrest and "grilling" followed hard on the heels of these demands.

Later, a representative of The Cleveland Press made the public boast that The Cleveland Press' handling of the Sheppard story produced the trial.

Six weeks after the murder, on August 17, 1954, defendant was indicted for first degree murder by a Grand Jury after presentation of the results of the Cleveland Police Homicide Unit's investigation.

The trial began October 17, 1954.

The Ohio Supreme Court described the setting for the trial thus:

> "Murder and mystery, society, sex and suspense were combined in this case in such a manner as to intrigue and captivate the public fancy to a degree perhaps unparalleled in recent annals. Throughout the preindictment investigation, the subsequent legal skirmishes and the nine-week trial, circulation-conscious editors catered to the insatiable interest of the American public in the bizarre. Special seating facilities for reporters and columnists representing local papers and all major news services were installed in the courtroom. Special rooms in the Criminal Courts Building were equipped for broadcasters and telecasters. In

this atmosphere of a 'Roman Holiday' for the news media, Sam Sheppard stood trial for his life." State v. Sheppard, 165 Ohio St. 293, 294, 135 N.E.2d 340, 342 (1956).

The trial verdict came after nine weeks of trial and five full days of jury deliberation. The prosecution had asked for and insisted on a verdict of first degree murder. The defense had asked for and insisted upon a verdict of "not guilty." The jury returned a verdict of second degree murder.

## THE TRIAL JUDGE AND THE PROSECUTOR

"It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit." [5]

The trial judge's son was a detective who worked in the Homicide Unit of the Cleveland Police Department which secured defendant's indictment by the Grand Jury.[6]

As the trial opened on October 17, the trial judge was a candidate for re-election to the Common Pleas bench in an election scheduled for November 2, 1954.[6]

The assistant prosecuting attorney in charge of the state's case in defendant's trial was likewise a candidate for election to the Common Pleas Court of Ohio—Ohio's highest trial court.

The election occurred during the trial. Both the trial judge and the chief trial prosecutor were elected.

The trial judge and the trial prosecutor posed together for a newspaper picture congratulating each other on their mutual victories. The picture was printed in The Cleveland News on November 3, 1954. (See Appendix B).

As the trial resumed, defendant was being prosecuted by an elected judge, equal in all respects to the trial judge, except in the taking of the oath of office.

---

5. Art. XXIX, Massachusetts Declaration of Rights (1780), 10 Anno. Laws of Massachusetts § 30, p. 32.

6. Neither of these facts are relied upon by petitioner as constitutional violations.

They plainly were known to petitioner's trial counsel. The first was discussed with the trial judge whose assurances of impartiality were accepted.

During the course of this trial, the trial judge's picture appeared in 46 issues of the Cleveland newspapers—including poses by him at the bench, reading a law book in chambers, in his shirt sleeves, pausing for a TV camera interview with Fabian of Scotland Yard on the steps of the courthouse (See Appendix C), and holding a press conference on the fourth day of jury deliberation on the verdict to announce his intention to keep them deliberating (See Appendix D).

## THE TRIAL JURY AND THE NEWS MEDIA

"The courtroom at these times is as sacrosanct as the cathedral, to be guarded against all raucous, impassioned, and foreign influence." [7]

News media interest in the case had increased as the trial date neared.

The names and addresses of all prospective jurors were published in the papers.

Extensive quotes from the *voir dire* examination of all prospective jurors were carried.

Every juror who ultimately was seated, except one, testified at *voir dire* to reading about the case in the Cleveland papers.

Every juror who was asked the specific question testified that a Cleveland newspaper was delivered daily to his or her home.

Seven of the twelve jurors who rendered the verdict were asked and did answer that they had one or more Cleveland papers delivered to their homes.

Five of the twelve jurors who rendered the verdict had The Cleveland Press delivered to their homes.

At the trial there were photographers inside the bar of Court immediately before the trial judge entered and immediately after the trial judge left the bench at any session where they desired to photograph the defendant, the jury, or the witnesses.

There was a table full of reporters and commentators within the bar of the court all through trial within one foot of the jury box.

All other seats in the courtroom, except those in the very last row, were assigned by the trial judge to news media representatives who were admitted on passes.

Half of the last row was assigned by the trial judge to the Sheppard family and half to Marilyn's family.

On the first day after it was sworn in, the jury was called back and posed in the jury box, with the pictures appearing in The Cleveland Press (See Appendix E).

On the same afternoon a reporter for The Cleveland Press was chosen as a representative of the press to accompany the jury on a tour of the Sheppard home.

On this same tour The Cleveland Press had a helicopter photographing the jury at the murder scene and subsequently published the photograph thus taken.

During the trial the jury's pictures, or those of one or more jurors, appeared in the newspapers 40 times (Cf. Appendix F).

These photographs included pictures of the jury, taken with the trial judge's permission, at lunch in the jury room (See Appendix G).

They also included repeated arranged photographs of the jury taken during the five days of their deliberations on the verdict. For one of such, see Appendix H.

There were also photographs taken during the trial in the home of the alternate juror (and printed in The Cleveland Press) picturing her husband, her mother, and her children (See Appendix I).

## THE TRIAL RULINGS

"The rules of court room conduct must be such as to remove it from the distractions and disturbances of the market place, and to maintain as nearly as possible an atmosphere

7. Justice William O. Douglas, Public Trial and the Free Press, 46 A.B.A.J. 840, 844 (Aug. 1960.

conducive to profound and undisturbed deliberation. \* \* \* A court in enforcing reasonable court room decorum is preserving the constitutional and unalienable right of a litigant to a fair trial, and, in preserving such right, the court does not interfere with the freedom of the press." [8]

As this trial opened the trial judge had ample warning from the pretrial events which we have recited as to the nature and aggressiveness of the publicity which might attend the trial.

The first matters before the Court on October 18, 1954, were defense motions for change of venue and continuance based on pretrial publicity and the trial arrangements for the news media. Defense counsel in reciting those arrangements pointed out "Even your Honor yourself, when you tried to mount the bench this morning, found your place occupied by a photographer taking pictures, and you had to remove him from the bench."

The following from one of the first day colloquies between Court and counsel vividly portrays the setting of this trial:

"MR. CORRIGAN: If the Court please, I would like the record to show that inside the bar, as I stated before, is a table, and that that table extends over the width of the courtroom; that this courtroom is 26 by 48 feet; that the table runs east and west, and that the west end of the table is within six inches of the seat of the thirteenth juror and approximately two feet from the end of the jury box; that there has been assigned to that table representatives of the following news agencies:

"The Akron Beacon Journal; two seats for the International News Service; three seats for the Cleveland Press; three seats for the Cleveland News; three seats for the Cleveland Plain Dealer; two seats for the Associated Press; and a seat for the New York Journal American.

"That outside the rail or back of the rail in this courtroom, there are four rows of benches for spectators. That the first row of the spectators' benches have been assigned by the Court as follows, and are occupied by the following news services:

"Two seats to WGAR; two seats to WERE; one seat to WCUE; one to WTAM; two seats to WNBK; one seat to WDOK; one seat to WEWS; one seat to WHK; one to WXEL, all of these assignments being to representatives of broadcasting stations, radio stations or television stations, and one seat to the NEA, Newspaper Enterprise Association.

"That row two of the seats in the courtroom is assigned as follows:

"The Newark, New Jersey, News; the New York Post; the Pittsburgh Post Enterprise; two seats to the Cleveland News; two seats to the Cleveland Plain Dealer; two seats to the Cleveland Press, the Toledo Blade, the Pittsburgh Post–Gazette, the Lorain Journal, the Chicago Sun-Times, and the Scripps-Howard News Association.

"That the third row is assigned to WAKR; to the International News Service; the New York Journal American; Radio Station WSRS, Cleveland Heights; Detroit News; the New York News; two seats are assigned to Life Magazine; one to NBC and the St. Louis Post Dispatch.

**8.** State v. Clifford, 97 Ohio App. 1, 5–6, 118 N.E.2d 853, 856 (1954), aff'd., 162 Ohio St. 370, 123 N.E.2d 8 (1954), cert. denied, 349 U.S. 929, 75 S.Ct. 771, 99 L.Ed. 1259 (1955). Ohio Appellate decision, April 14, 1954. Ohio Supreme Court decision, December 15, 1954. In these cases the Ohio Appellate Court upheld contempt convictions against three employees of The Cleveland Press for violating Judge Silbert's order against "picture taking while the court was in session."

Judge Silbert was a member of the same Common Pleas bench as the trial judge in the instant case.

"That the last—the only row of seats in the courtroom that is not assigned is the last row of the courtroom which accommodates about 14 people.

"We also wish to note in the record that there are in this courtroom three loud speakers and a microphone which stands in front of the witness chair.

"We incorporate all these things in the record before your Honor in the matter of our motion, both our motions, and we move at this time that the—I will change that.

"I state on information, on which I may be corrected if it is not so, that the seats that I have referred to were assigned by the Court, and that certain designations were put on the table and on the seats designating the locations for these different organizations and newspapers that I have mentioned, and that that assignment was made by the Court on Wednesday of last week.

"Am I correct in that, your Honor?

"THE COURT: I beg pardon. I didn't get the last seat.

"MR. CORRIGAN: I say, I understand that these assignments whereby the courtroom is occupied as I have outlined was made by the Court on Wednesday of last week. Is that correct?

"THE COURT: Oh, no. That is not true. The Court will state as to what happened, also when you get through.

"MR. CORRIGAN: I noticed before we came to the courtroom that the three rows of seats back of the rail—there was posted on them a sign designating to whom they belonged, and that the signs designated these various radio stations and these various newspapers that I have mentioned, and that was done in advance of the trial. Is that correct?

"THE COURT: Yes, that's correct. The Court will state now for the record, also, that these arrangements that counsel has now referred to have all been had after a great deal of consideration, applications for space, but finally with the approval of the Court. There is no question about that at all. The arrangements as to the table for members of the local press in particular, and the national news services, were made sometime in the middle—perhaps Wednesday of last week, as counsel has indicated.

"Also, the next row, for the simple reason that those were set aside for local parties and the national news services, the second row in particular for the radio station representatives, and they selected the actual spaces within the—I mean the actual space for each individual within the total space, and they placed their tags on them so that each person will know where he sits.

"The others back of that were designated by the Court in the order of applications received for them.

"The back seat was kept for the members of the Sheppard family and the members of the late Mrs. Sheppard's family, and any other members of the public who will be admitted.

"The Court did that for the simple reason that the space is so very limited in the courtroom, and there is a request for space for far more people than can be accommodated at all.

"The Court will not during the progress of this trial permit any standees in the courtroom, and we are going to conduct this trial with that kind of decorum which befits a trial of any criminal case.

"As to the public address system within the courtroom, that was installed at the request of the Court because it is difficult to hear, particularly witnesses, in the back of

the courtroom, and it is very difficult at times for the jurors to hear witnesses. We are in a location where there is industry, light industry, it is true, a good deal of traffic, truck and other, and it is a place very difficult in which to hear at times.

"Let it be noted that this loud speaker—that these loud speakers are for the sole accommodation of the jurors, the members of the press and public in the rear of the courtroom, and especially for counsel at the trial table.

"There is no commmunication from inside the courtroom to any outside source, and all of these arrangements have been approved by the Court.

"Does that cover the——

"MR. CORRIGAN: Yes. If the Court please, I now move that the table be taken from inside the bar and removed from this courtroom; that the signs that have been placed on the three rows of spectators' benches be removed, and, as I understand, your Honor has issued cards, admission by cards.

"THE COURT: That's right.

"MR. CORRIGAN: And that the Court rescind the order whereby the only admission to this courtroom is by card issued by him. I so move.

"THE COURT: Overruled.

"MR. CORRIGAN: Exception.

"THE COURT: Now may we have the first juror?"

In addition to denying these motions the trial judge also denied a motion for continuance and took under advisement the motion for change of venue until an attempt to impanel a jury had been made.

On October 25 the trial judge denied defendant's motion for change of venue, holding that the jury impaneled demonstrated that a fair trial could be had in Cleveland.

On that same date the trial judge sent the jurors who had been chosen to try this case home overnight—as he did for the subsequent weeks of this nine-week trial. (It should be pointed out that no motion to sequester the jury was ever made.)

On October 28, after impaneling twelve jurors, the trial judge finally denied the motion for change of venue.

On October 28 also, the trial judge gave the jury the basic "admonition" which he employed in this trial:

"Ladies and gentlemen of the jury, now that you have been sworn as jurors for the trial of this case and you are about to leave this courtroom, the Court is going to do what the law of this state calls for and requires that he shall do. I have already stated to you what the law prescribes, and I will state it again in order that there be no misunderstanding whatever about it.

"You are not to talk to anyone about this case or any matter in connection with it at any time during the progress of this trial. You are not to permit others to talk to you about it. You are not to remain anywhere where other people are talking about it among themselves, whether they have an interest in the case or not. You are not to discuss it among yourselves, either in your jury room or elsewhere.

"It is the duty of a person who has been selected as a juror to sit here patiently and wait until all the evidence has been received and the instructions of the Court have been received and you are in your jury room for deliberation and decision before you discuss the matter in any manner, and in the meantime, you are individually to keep your own counsel and not to form any opinion or judgment whatever until the final step when you are in your jury room for deliberation and decision of this case.

"Will you be good enough to observe that caution during the progress of the trial? And I would sug-

gest to you, as I have already done so—I don't know whether you were all here at that time or not—that you do not read the newspapers and you do not now listen to comments over the radio or by any other means until this case has been disposed of. Have somebody preserve those things for you until some future day when you will have lots of time to look them over.

"Now, without any formality at all, we will be adjourned until 9:15 tomorrow morning."

(It should be noted that the portion of the admonition which dealt with talking about the case, or allowing anyone to talk to them, was phrased in direct and commanding language. That portion of the admonition pertaining to news media employed the words "I would suggest to you."

Subsequent to October 28 a form of this "admonition" was given just four additional times up to the charge of the Court on December 17. On three of those occasions the word "suggest" was employed. Finally on December 3, the trial judge employed the somewhat more direct language, "Please do not read newspapers," etc.)

Thus by the 28th of October, basic judicial rulings on four of the major measures available to the trial judge to protect due process had been made.

On November 2, 1954, the trial was adjourned for election day. The trial judge was re-elected overwhelmingly.

On November 3 the jury as finally constituted was sworn in. The subsequent events of that day were recorded in the following colloquy on the morning of November 4:

"MR. CORRIGAN: If the Court please, I desire to renew my motion for a continuance of this case, for a change of venue, for the withdrawal of a juror and for a mistrial.

"(To the reporter): Would you read what I dictated yesterday?

"(Thereupon the following was read by the reporter, being taken at 11:00 o'clock a. m., Wednesday, November 3, 1954:

"'After the jury was discharged at the end of the morning session, at the request of the newspapers, the jury was brought back into the room and sat in the room for a matter of—how long, 15 minutes, 10 minutes?

"'Mr. Clifford: 10 minutes, yes.

"'Mr. Corrigan: (Continuing) And were subjected to photography, photographing and television cameras by at least 10 cameramen who mounted themselves on chairs, the judge's bench and various parts of the room. This was all done out of the presence of defendant, Sam Sheppard.')

"MR. CORRIGAN: I also want to introduce, as part of my motion, Defendant's Exhibits 63, 64 and 65.

"(Defendant's Exhibits 63, 64 and 65 were marked for identification.)

"MR. CORRIGAN: When the jury visited the premises yesterday under the order of the Court, there was at least 40 reporters there, a great number of cameramen, and the Cleveland Press hired a helicopter which continued to swing over the house and take pictures with a great deal of noise and racket.

"When the jury went through the house, it was accompanied by a reporter of the Cleveland Press, Mr. Brady.

"So I renew all my motions at this time.

"THE COURT: They all be overruled, and exceptions noted."

(It should be noted that subsequent discussion developed that Brady's accompaniment of the jury at the Sheppard home had been with the trial judge's prior knowledge and with the consent of the defense, which had been given by one of defendant's attorneys.)

Monday evening, November 22, the trial record shows still another objection

to news media trial privileges, the rulings of the trial judge denying requested relief, and a cautioning of defendant's brother concerning trial publicity.

"MR. CORRIGAN: I desire to renew my motion for a change of venue and a continuance of this case. Ever since we have started in this case, the halls and the rooms surrounding the Court House—or, surrounding the court room have been filled with reporters and photographers and television operators.

"The assignment room and the witness room have been occupied entirely by newspaper reporters, radio and television operators. On each morning the defendant has been brought into court at least 10 minutes before the beginning of the trial, and then for that period of time has been subjected by many photographers and television cameras, against his will, to be photographed.

"This morning—what is today?

"THE COURT: The 22nd.

"MR. CORRIGAN: November 22nd, there was erected in front of the Court House television cameras, WNBK. They were there when the jury was entering the Court House. The judge participated in being televised, as did Mr. Mahon and Mr. McArthur.

"We, therefore, renew the motions heretofore made, ask for the withdrawal of a juror and a continuance of the case.

"THE COURT: Of course, that will be overruled and exceptions noted.

"MR. CORRIGAN: Now, then, we request the court that the rights of the defendant be protected in this court room, and that he be not compelled to submit to photographing and the television camera as he has been every morning with the knowledge of the court.

"We request that the Sheriff be ordered not to bring him into court until such time as the jury is seated.

"THE COURT: Well, that is more than one request. The court will make his position clear.

"First, there has been no photographing in the court room except upon strict orders of the court that it was to be done before court hours in the morning or after court hours in the evening and with the consent of counsel for the defendant.

"MR. CORRIGAN: I have given no consent to that.

"THE COURT: And let the record show that counsel for the defendant and the defendant, himself, have been voluntarily photographed in the court room from time to time during the progress of this trial.

"MR. CORRIGAN: I haven't been voluntarily photographed. Neither has the defendant. We have been compelled to be photographed. We can't escape it.

"THE COURT: Oh, no, I don't think that is so, Mr. Corrigan, and the court will say to you that the defendant is not to be photographed in the court room at all without your consent.

"MR. CORRIGAN: Well, if there has been any consent by anybody in this matter, the consent is withdrawn.

"THE COURT: All right. Now, as to the defendant being brought into the court room he is to be brought into the court room prior to the opening of the trial each day and just before the jury enters. That has been our effort since the beginning of this trial.

"Now, the Court wants to say a word. That he was told—he has not read anything about it at all—but he was informed that Dr. Steve Sheppard, who has been granted the privilege of remaining in the court room during the trial, has been trying the case in the newspapers and making rather uncomplimentary comments

about the testimony of the witnesses for the State.

"Let it be now understood that if Dr. Steve Sheppard wishes to use the newspapers to try his case while we are trying it here, he will be barred from remaining in the court room during the progress of the trial if he is to be a witness in the case.

"The Court appreciates he cannot deny Steve Sheppard the right of free speech, but he can deny him the right of the privilege of being in the court room, if he wants to avail himself of that method during the progress of the trial.

"MR. CORRIGAN: The statement of the Court about Steve Sheppard making uncomplimentary remarks about the testimony of witnesses is paralleled by the tremendous amount of publicity that is put in the Cleveland newspapers, especially headlines, since the beginning of this case, which has misrepresented entirely the testimony."

These motions for change of venue, continuance, and mistrial were renewed repeatedly thereafter (including the close of prosecution proofs and the close of defense proofs) and were similarly denied.

### DUE PROCESS VIOLATIONS

"The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by ar.y outside influence, whether of private talk or public print." [9] Justice Oliver Wendell Holmes.

It is, of course, too late in legal history to doubt the power and the duty of a federal District Court to review on habeas corpus a state court conviction claimed to have been based upon violations of applicable federal constitutional commands. 28 U.S.C. § 2241; Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed. 2d 837 (1963); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

It is likewise beyond challenge that the "due process" requirement of the Fourteenth Amendment [10] mandates state criminal court observance of minimum federal constitutional standards such as trial on a charge "fairly made and fairly tried in a public tribunal" before "an impartial judge," In re Oliver, 333 U.S. 257, 278, 68 S.Ct. 499, 510, 92 L.Ed. 682 (1948); Tumey v. State of Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); an "impartial jury" (if, as all do, the state elects a jury system), Irvin v. Dowd, supra, 366 U.S. at 721–722, 81 S.Ct. 1639; Rideau v. State of Louisiana, supra; and a "verdict * * * based upon the evidence developed at the trial," Turner v. State of Louisiana, supra, 379 U.S. at 472, 85 S.Ct. at 549. See also Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); Garner v. State of Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961).

In January of 1965 the United States Supreme Court said:

"The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. [See footnote.] 'The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law.' Sinclair v. United States, 279 U.S. 749, 765, 49 S.Ct.

9. Patterson v. State of Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907).

10. The Fourteenth Amendment to the United States Constitution provides in applicable part: " * * * nor shall any State deprive any person of life, liberty, or property without due process of law; * * *."

471, 476, 73 L.Ed. 938. Mr. Justice Holmes stated no more than a truism when he observed that 'Any judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere.' Frank v. Mangum, 237 U.S. 309, at 349, 35 S.Ct. 582, at 595, 59 L.Ed. 969 (dissenting opinion).

"In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public court room where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. * * *"

[Footnote] "The Sixth Amendment provides:

'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an *impartial* jury of the State and district wherein the crime shall have been committed * * *.' (Emphasis supplied.)"

Turner v. State of Louisiana, supra, 379 U.S. at 472–473, 85 S.Ct. at 549.

If ever a jury could be said to be likely to have been "impregnated by the environing atmosphere," it was surely this jury. And I do not see how this Court can safely conclude that the jury verdict was based only on "the 'evidence developed' against a defendant * * * from the witness stand."

However applicable to this trial these standards may be, they are also generalizations. I would affirm the District Judge's writ in this case on the basis of specific due process violations which occurred during trial and for all of which there were both preventive measures beforehand and remedies afterward available to, but unused by, the trial judge.

At trial the principal issues upon which testimony was presented to the jury were 1) motive, 2) credibility, and 3) reputation. On each issue the evidence presented and inferences argued by prosecution and defense were in sharp conflict. On each issue the jury could have believed either side.

But on these same crucial issues, as the trial progressed the news media supplemented the total record with material never heard in the courtroom. Much of this material, though highly prejudicial to defendant, was relevant and admissible if a witness could have been found who was prepared to testify to it under oath in the courtroom and face cross-examination. Some material, though equally prejudicial, was obviously inadmissible under any circumstances.

The United States District Judge listed 30 different instances of objectionable news media communications which he felt were prejudicial. We shall discuss only five of these.

1. On Friday, November 19, 1954, a police officer of the Cleveland Police Department gave testimony during this trial which tended to contradict some portions of defendant's statements as made to the Cleveland Police.

On November 21, at 6:30 p. m., there was a radio broadcast which was heard in Cleveland over Station WHK in which Mr. Robert Considine made a comparison between defendant and Alger Hiss. Defendant's confrontation by Officer Shottke was compared to Alger Hiss' confrontation with Whittaker Chambers.

At the time in 1954, Alger Hiss' conviction was fresh in the national consciousness.

Robert Considine was one of the national commentators occupying reserved seats in the courtroom during this trial.

On November 22, at the commencing of court, defendant's counsel moved for a continuance of the trial, based on prejudice resulting from the Considine broadcast and asked the trial judge to question the jury as to whether they heard the broadcast.

The judge denied both motions, saying in part:

"Well, I don't know, we can't stop people in any event, listening to it.

It is a matter of free speech, and the court can't control everybody.

"MR. MAHON: I think that the court has instructed the jury that they are not to read about it or listen to the broadcasts. It was a general instruction that was given at the time the trial started.

"THE COURT: We are not going to harass the jury every morning.

"MR. CORRIGAN: I can't help it, Judge. If you don't, that's all right with me. I make my exception.

"THE COURT: It is getting to the point where if we do it every morning, we are suspecting the jury. I have confidence in this jury, and we must have confidence or the jury system is of no value whatever to anybody."

Prior to dealing with this motion, the trial judge (as we have noted) had just denied a defense motion for continuance based upon a television program conducted on the steps of the courthouse the same morning, where among others, the prosecutor and the trial judge had appeared. The trial judge's picture at this appearance was published in one of the Cleveland papers on the day these motions were heard and denied (See Appendix C).

2. On November 24 The Cleveland Press published a front page eight-column headline: "Sam Called a 'Jekyll-Hyde' by Marilyn, Cousin to Testify." The first three paragraphs of the news story follow:

"Two days before her death, murdered Marilyn Reese Sheppard told friends that her accused husband, Dr. Samuel H. Sheppard, was 'a Dr. Jekyll and Mr. Hyde.'

"The prosecution has a 'bombshell witness' on tap who will testify to Dr. Sam's display of fiery temper—countering the defense claim that the defendant is a gentle physician with an even disposition.

"One of Mrs. Sheppard's 'Dr. Jekyll and Mr. Hyde' statements was made to Bay Village Mayor J. Spencer Houk as recently as last June, The Press learned." (See Appendix J).

No such testimony was ever introduced at the trial.

Five of the jurors had testified that they received The Cleveland Press at their homes.

On November 26 defense counsel renewed his motions for change of venue and continuance and a mistrial, basing them on the Jekyll-Hyde story in The Cleveland Press, which he introduced as an exhibit (See Appendix J).

Defense Counsel also based his motions on a Thanksgiving Day edition of The Cleveland Press which contained pictures and interviews in the home of Mrs. Mancini—one of the jurors (See Appendix I).

The trial judge, without reference to the Jekyll-Hyde matter, overruled the motions, noting that Mrs. Mancini had not been home at the time of the interview and picture taking. He made no inquiry of the jurors as to either matter.

3. On December 5, Walter Winchell, in a nationwide broadcast heard and seen in Cleveland through WXEL television and WJW radio, stated that a Carol Beasley, who was under arrest in New York for robbery, had stated that she was defendant's mistress and had had a child by him.

On December 6 these facts were related to the trial judge who responded:

"THE COURT: Well, even, so, Mr. Corrigan, how are you ever going to prevent those things, in any event? I don't justify them at all. I think it is outrageous, but in a sense, it is outrageous even if there were no trial here. The trial has nothing to do with it in the Court's mind, as far as its outrage is concerned, but—

"MR. CORRIGAN: I don't know what effect it had on the mind of any of these jurors, and I can't find out unless inquiry is made.

"THE COURT: How would you ever, in any jury, avoid that kind of a thing?"

At defense counsel's insistence the judge did query the jury as to whether any had heard the Walter Winchell broadcast the previous night. Two jurors responded that they had.

Thereupon the judge asked, "Would that have any effect on your judgment?" Each said, "No."

The trial judge accepted this inadequate assurance.[11] He did not reprove the two jurors for failing to heed his "suggestion" that they not listen to TV or radio. He did not order them or the rest of the jury not to do so again. He told the jury "to pay no attention whatever to that type of scavenging." He then proceeded with the trial.

4. On December 9, 1954, defendant took the witness stand.

During part of his direct testimony he testified to oral promises and oral abuse by various members of the Cleveland Police Department Homicide Bureau who interviewed him extensively after his arrest.

On December 11, the Cleveland News, printed a front page story under the headline " 'Bare-Faced Liar,' Kerr says of Sam." The story quoted Captain David E. Kerr, head of the Homicide Bureau, to the same effect and adding:

" 'If ever a person was handled with kid gloves, it was Dr. Sam,' said Kerr. 'In 800 homicide cases we have not had a single voice raised against our methods, until this one from the Bay Village doctor.' " (See Appendix K).

Captain Kerr never appeared as a witness at the trial.

5. After the close of evidence and the arguments and the charge had been given, this jury was locked for its deliberations on verdict. These continued for five days and four nights. Subsequent to the rendering of the verdict it became known to the defense that the individual jurors had been permitted repeated phone calls to their homes. This knowledge was made the basis for a motion for new trial made by defense counsel.

The stipulation of facts agreed on by the parties before the United States District Judge gives the details on this issue:

"After arguments and charge were complete, the jury was directed to retire to deliberate its verdict. They were placed in charge of two bailiffs, Edgar Francis and Simon Steenstra. The deliberations lasted for more than four days, during which time the jury was kept (except when at court deliberating) in the Carter Hotel in downtown Cleveland. They, together with the bailiffs, occupied the entire seventh floor of the hotel. Bailiff Steenstra had made arrangements whereby the telephones in the rooms occupied by the jurors were disconnected so that no calls could be placed or received.

"The record does not indicate the times, the number of calls, or the identity of the juror-callers, but it is clear that both Steenstra and Francis permitted jurors to place outside calls from their (the bailiffs') rooms between the time the jury took the case (December 17, 1954) and the time the verdict was rendered (December 21, 1954). The calls were placed by the jurors. No records were kept as to the numbers called, the parties called, talked with, or the calling jurors. The bailiffs sat next to the phone as the conversations took place, but could only hear that half of the conversation made by the juror; what was said *to* the jurors could not be heard by the bailiffs. The Court was never asked for permission to allow the jurors to make these calls, and no permission was ever given." (Emphasis in original)

---

11. Cf. Coppedge v. United States, supra.

## THE UNITED STATES DISTRICT JUDGE'S HOLDINGS

Concerning the first four of the events we have cited (and others) Judge Weinman said:

"[S]pecial note must be given to the attempt of the newspapers to influence the jury. It was startling to find photographs of the entire jury and of individual jurors (at times giving their home addresses) in no less than 40 issues of the Cleveland newspapers. The Court need not be naive, and it does not stretch its imagination to recognize that one of the purposes of photographing the jurors so often was to be assured that they would look for their photographs in the newspapers and thereby expose themselves to the prejudicial reporting." Sheppard v. Maxwell, 231 F.Supp. 37, 63 (1964).

"It is clear beyond doubt, because of the sheer volume of publicity which attended the trial, that the jury read and heard about the case through the news media." (Footnote omitted.) Sheppard v. Maxwell, supra at 62.

Rule 52(a) of The Federal Rules of Civil Procedure states in part that "[f]indings of fact shall not be set aside unless clearly erroneous * * *." This rule is applicable to review of federal habeas corpus proceedings. United States ex rel. Crump v. Sain, 295 F.2d 699 (C.A. 7, 1961), cert. denied, 369 U.S. 830, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962); Rushing v. Wilkinson, 272 F.2d 633 (C.A. 5, 1960). See also Cases Annotated at n. 57, 28 U.S.C.A. Rule 52.

In this trial all jurors, save one, freely admitted reading about the case before trial.

This jury was never locked up for the nine weeks of trial.

At least seven of the jurors took newspapers at their homes. Five of them took The Cleveland Press. The news media were given extraordinary prominence and privileges in the courtroom.

No admonition of an unequivocal nature concerning the jury not reading or listening to material about the trial was given until after a month of testimony.

The judge allowed himself and the jury all through the trial to be the constant subject of newspaper photography.

When queried on the one occasion when inquiry was allowed, two jurors testified to hearing the Walter Winchell broadcast.

They were not reproved nor were they or the other jurors told not to do it again.

The two newspaper stories were front page stories in newspapers of general circulation. The Cleveland Press "Jekyll-Hyde" story was topped by an eight-column, double banner front page headline.

The two broadcasts were by nationally prominent commentators broadcasting on prime time in Cleveland.

With these facts before us, I do not see how we can say that the District Judge's holding is "clearly erroneous."

The District Judge's opinion in respect to these instances of prejudicial trial publicity is founded upon ample precedent.

Newspaper articles actually read by a juror or jurors which convey highly prejudicial information not admissible or admitted at trial have long been recognized as constituting such essential unfairness as to justify the setting aside of the verdict and the granting of a new trial. Mattox v. United States, supra; Krogmann v. United States, supra.

Where flagrantly prejudicial newspaper articles are prominently printed in newspapers of general circulation during a trial wherein the jury is not sequestered, there is a presumption that some jurors have seen them and that defendant has been prejudiced thereby. Harrison v. United States, 200 F. 662 (C.A.6, 1912); Marson v. United States, supra; Krogmann v. United States, supra; Briggs v. United States, 221 F.2d 636 (C.A.6, 1955).

Unless this presumption of prejudice is overborne by careful inquiry of the jurors and, in appropriate cases, by strong admonitions to disregard, a mo-

tion for new trial should be granted. Krogmann v. United States, supra; Marson v. United States, supra; Briggs v. United States, supra; United States v. Accardo, supra.

As we have seen, the admonitions in this trial were infrequent and equivocal when given. And minimal inquiry was limited to the single instance of the Winchell broadcast.

In concurring in Irvin v. Dowd, Mr. Justice Frankfurter said:

"Not a Term passes without this Court being importuned to review convictions, had in States throughout the country, in which substantial claims are made that a jury trial has been distorted because of inflammatory newspaper accounts—too often, as in this case, with the prosecutor's collaboration—exerting pressures upon potential jurors before trial and even during the course of trial, thereby making it extremely difficult, if not impossible, to secure a jury capable of taking in, free of prepossessions, evidence submitted in open court. * * * For one reason or another this Court does not undertake to review all such envenomed state prosecutions. But, again and again, such disregard of fundamental fairness is so flagrant that the Court is compelled, as it was only a week ago, to reverse a conviction in which prejudicial newspaper intrusion has poisoned the outcome. Janko v. United States, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846; see, e. g., Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250. See also Stroble v. State of California, 343 U.S. 181, 198, 72 S.Ct. 599, 607, 96 L.Ed. 872 (dissenting opinion); Shepherd v. State of Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740 (concurring opinion)." Irvin v. Dowd, supra, 366 U.S. at 730, 81 S.Ct. at 1646 (concurring opinion.)

In my opinion the "disregard of fundamental fairness is so flagrant" in this case as to require the District Judge's writ.

On the fifth issue, pertaining to juror phone calls during jury deliberations, Judge Weinman found:

"This Court finds prejudicial error because the right to a fair and impartial trial as guaranteed by the due process clause of the Fourteenth Amendment includes the right to have a jury which is not permitted, after it begins its deliberations, to have unmonitored telephone conversations with third persons. As stated quite simply in Mattox v. United States, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892):

" 'Private communications, *possibly* prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least until their harmlessness is made to appear.' [Emphasis added].

"There is nothing in the record to show the harmlessness of that part of the telephone conversations which the bailiffs could not hear. Accordingly, petitioner's constitutional rights were violated." Sheppard v. Maxwell, supra, 231 F.Supp. at 71.

Here, too, the District Judge has sound precedent in support.

The federal courts (including the United States Supreme Court and this Court) have created and given effect to the presumption that any unauthorized communication with a juror is prejudicial absent effective rebuttal. Mattox v. United States, supra; Stone v. United States, supra; Little v. United States, supra; Wheaton v. United States, supra; Johnson v. United States, 207 F.2d 314 (C.A. 5, 1953), cert. denied, 347 U.S. 938, 74 S.Ct. 632, 98 L.Ed. 1087 (1953); Ryan v. United States, 89 U.S.App.D.C. 328, 191 F.2d 779 (1951), cert. denied, Duncan v. United States, 342 U.S. 928, 72 S.Ct. 368, 96 L.Ed. 691 (1951).

The presumption is even stronger when there is communication with a member or

members of the jury after charge and during jury deliberation concerning the verdict. Mattox v. United States, supra; Wheaton v. United States, supra; Little v. United States, supra.

In 1892 Chief Justice Fuller, speaking for a unanimous Court, said:

> "It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated. Hence, the separation of the jury in such a way as to expose them to tampering may be reason for a new trial, variously held as absolute; or *prima facie*, and subject to rebuttal by the prosecution; or contingent on proof indicating that a tampering really took place. Whart.Crim.Pl. §§ 821, 823, 824, and cases cited.

> "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." Mattox v. United States, supra, 146 U.S. at 150, 13 S.Ct. at 53.

There is absolutely no way by which we can know that these phone calls— totally unmonitored as far as the outside party is concerned—were harmless. I believe that Judge Weinman was correct in relying on this ground also.

## THE OPINION OF THE COURT

For the reasons stated, I find myself in disagreement with the Court concerning the fundamental issues of this appeal.

My brothers have, however, written a careful and scholarly opinion. I concur with the result reached in three out of the five of the issues discussed therein.

The federal courts, of course, do not review claimed federal constitutional violations until state remedies have been exhausted. Thorough as have been petitioner's efforts in this regard, it cannot be clearly established that claimed violations of defendant's Fifth Amendment rights (through lie detector testimony) have been presented to the Ohio Supreme Court. Nor have the belated witness statements as to the trial judge's comments on defendant's guilt ever been considered by that body.

I also agree with my brothers that the clamorous and frequently abusive publicity *prior* to trial, plus the trial judge's denial of change of venue, probably did not, of themselves, rise to the level of constitutional violations.

As Judge O'Sullivan notes, the number of jurors with fixed opinions about this case as of the time the jury was seated does not show the same extent of deep and abiding community prejudice demonstrated in Irvin v. Dowd, supra, and Rideau v. State of Louisiana, supra.

Of some weight in the consideration of the pretrial publicity issue is a concern for that particular declaration of rights which our forefathers chose to put first among the amendments. If the exercise of freedom of speech or press in reporting or exposing crime could serve to immunize a person charged with crime from prosecution and trial, shortly the demands for limitation of this historic right would become extremely pressing. The smarter criminal would know how to find a means to immunize himself from trial by securing publication of a well-timed if adverse story. The power of the press to aid in maintaining the integrity of government by exposing corruption or special privilege would be largely nullified.

In one of the relatively few cases where the United States Supreme Court has set aside State Court convictions because of pretrial publicity, Mr. Justice Clark noted:

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of

those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Spies v. People of State of Illinois, 123 U.S. 131, 8 S.Ct. 22, 31 L.Ed. 80; Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021; Reynolds v. United States, supra. [98 U.S. 145, 25 L.Ed. 244]." Irvin v. Dowd, supra, 366 U.S. at 722–723, 81 S.Ct. at 1642.

To return to the basic problems of this appeal, it is clear that the District Judge considered the claimed violations of due process against the background of the trial itself and cumulatively in relation to each other. His opinion notes:

"Any one of the above mentioned factors, i. e., the insidious, prejudicial newspaper reporting, the refusal of the trial judge to question jurors regarding an alleged prejudicial radio broadcast and the carnival atmosphere which continued throughout the trial, would be sufficient to compel the conclusion that petitioner's constitutional rights were violated. But when they are cumulated, this Court cannot, unless it were to stretch its imagination to a point of fantasy, say the petitioner had a fair trial in view of the publicity during trial." Sheppard v. Maxwell, supra, 231 F.Supp. at 63.

Against this view, I read the Court's opinion as holding that no one of the complaints of contacts or communications with this jury was sufficient *standing alone* to represent invasion of petitioner's due process rights.

If we were to assume that the five instances of unauthorized communications to this jury, considered as entirely isolated incidents, did not rise to constitutional magnitude,[12] we still could not by such dissection of this trial ignore our constitutional duty to look at the trial as a whole and to determine from the total record whether the Fourteenth Amendment command of due process had been violated.

These five events which occurred during this trial, when considered cumulatively and against the trial background related at the outset, leave no doubt of the validity of the District Judge's holding that "petitioner was not afforded a fair trial as required by the due process clause of the Fourteenth Amendment."

Any other view would deny common sense as effectively as saying that since no single one of the 35 wounds was necessarily fatal, Marilyn Sheppard was not murdered.

Patently there can be judicial error which against the background of one case might be harmless, but which against the total circumstances of another case might violate substantial rights. United States v. McMaster and Wolff, 343 F.2d 176. (C.A. 6, 1965) Decided March 25, 1965. Cf. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The background facts of a case wherein due process violations are claimed are never irrelevant. Irvin v. Dowd, supra; Rideau v. State of Louisiana, supra.

In Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), the United States Supreme Court dealt with a claim of prejudice because inadmissible material from news accounts had reached the jury during trial. Noting the large discretion that the trial judge had in ruling on the issue of prejudice, the Court nonetheless reversed for new trial stating that "each case must turn on its special facts."

12. As to the instances of communications numbered 1, 2, 3, and 5 herein, there is little reason to accept such an assumption.

The "special facts" of this case compel my vote for affirmance. They come as a distinct shock to the conscience of this former state court judge.

As we have noted, Judge Weinman's duty to review petitioner's federal constitutional claims concerning his state court trial cannot be disputed. Fay v. Noia, supra; Townsend v. Sain, supra; Gideon v. Wainwright, supra.

I read such cases as Turner v. State of Louisiana, supra; Rideau v. State of Louisiana, supra; Irvin v. Dowd, supra, as applicable *a fortiori* to the fact situation heretofore outlined and as authority for issuance of the writ, unless a new trial is ordered.

I would affirm.

### APPENDIX A

### PRETRIAL ORDER
### AGREED STATEMENT OF FACTS

"Petitioner, Samuel H. Sheppard, was in July, 1954, a resident of Bay Village, Ohio, a suburb on the west side of Cleveland. He was a doctor of osteopathic medicine, specializing in Surgery, and a member of the staff of the Bay View Hospital. He was thirty years of age and was married to Marilyn Reese Sheppard, also thirty. They had been marrid for nine years and had one son, aged seven. Petitioner and his family lived in a house on the shore of Lake Erie, which house was owned by Marilyn. Petitioner was associated in the practice of medicine with his father and two older brothers, all doctors. He was in comfortable financial circumstances.

"On the night of July 3, 1954, petitioner and his wife entertained friends, Don and Nancy Ahearn, in their home. The Ahearns left at approximately 12:30 a. m., July 4, 1954; Marilyn saw them to the door, for petitioner was or appeared to be asleep on a couch in the living room. The evening had been a congenial one, and the Ahearns observed no indications of hostility between petitioner and his wife (who was pregnant) at any time during the evening. In fact, there were overt manifestations of affection between them.

"Shortly before 6:00 a. m. a telephone call was received from petitioner by J. Spencer Houk, mayor of Bay Village and a friend of petitioner. Houk lived two houses distant from the home of petitioner. Houk heard petitioner say:

" 'My God, Spence, get over here quick, I think they have killed Marilyn.'

Houk dressed and with his wife, Esther, drove within a short time the few hundred feet to petitioner's home. Upon arrival the Houks found petitioner on the first floor of the house. His face showed some injury, and he complained of pain in his neck. Esther Houk went up to the bedroom, at the suggestion of petitioner, to check on the condition of Marilyn Sheppard. She found Marilyn lying in a pool of blood on the bed. She was dead. The room was covered with splattered blood. It was determined that she had suffered some thirty-five blows about the head by some blunt instrument, causing death. There was some conflict as to how long she had been dead when discovered by the Houks.

"The story given by petitioner to police and at the trial, was substantially as follows: As he was sleeping on the couch, he was awakened by a noise coming from the second floor. He thought he heard his name called. He went up the stairs, which was dimly lit by a light in the hall. He recognized only a white 'form' standing next to the bed where his wife slept. He grappled with the form, and was struck on the back of the neck which rendered him unconscious. Before losing consciousness petitioner heard loud moans, as if from someone injured. When petitiner recovered consciousness, he examined his wife, found or thought that she was dead, determined that his son (in an adjacent room) had not been harmed, and then, hearing noise of some sort on the first floor, ran down. He saw a form running out the door of the house nearest to Lake Erie, and pursued it to the shore. There he struggled again, and again lost consciousness. When he came to, he went back to the house, re-examined his wife, and called Mayor Houk.

Petitioner was unable to establish (1) the number of people in the bedroom at the time of the first encounter or the time of said encounter; (2) the duration of his unconsciousness on either occasion, or (3) the sex or identity of any of the single or several assailants he encountered. He stated that his perceptions had been vague because he was asleep at the outset of the chain of events, and unconscious twice as it progressed.

"In the course of interrogations by police and the County Coroner, petitioner was asked if he had had sexual relations with one Susan Hayes, an ex-employee of the hospital, in March, 1954, in Los Angeles. Petitioner denied this, but later admitted it when confronted with her statement of the affair. The state contended that Miss Hayes was the motive for a premeditated murder, but the jury returned a verdict of murder in the second degree.

"The murder of Marilyn Sheppard captivated the attention of news media in an unprecedented manner. Editorials on the first page of a leading Cleveland newspaper, and news media generally, set up a hue and cry for a solution to the crime. An inquest was demanded and held, and petitioner's arrest was suggested most strongly by at least one leading newspaper. On July 30, 1954, petitioner was arrested; he was admitted to bail, and indicted a few days later, on August 17, 1954. He has been in custody ever since.

"The trial began on October 18, 1954, and on December 17 of the same year the cause was submitted to a jury in the Court of Common Pleas of Cuyahoga County. On December 21st the verdict of guilty of murder in the second degree was returned, and petitioner was sentenced to life imprisonment in the state penitentiary at Columbus, Ohio. * * *

"The details of the trial, which fill over seven thousand pages in the bill of exceptions, are not recited here; it is the understanding of counsel for both sides

that it was not the purpose of this history to describe the voluminous evidence.

"On January 3, 1955, the trial court overruled a motion for new trial which had been based on numerous assignments of error occurring during trial and deliberation. * * *

"On May 9, 1955, the trial court denied a supplemental motion for new trial on ground of newly discovered evidence and based upon the affidavit of Paul Leland Kirk, a criminologist, who claimed to have demonstrated that blood tests made in the murder room proved the existence of blood which did not come from the defendant or the deceased. This evidence was not obtained until after the verdict had been returned.

"On July 20, 1955,[1] the Court of Appeals of Cuyahoga County affirmed the conviction of petitioner; and on July 25, 1955 the same Court affirmed the denial of the second motion for new trial. * *

"On May 31, 1956, the Ohio Supreme Court affirmed the action of the Court of Appeals as to the case in chief, but did not discuss or pass upon the alleged newly discovered evidence. Two Judges dissented, expressing the view that Sheppard should be accorded a new trial. * *

"On November 14, 1956, the Supreme Court of the United States denied a petition for certiorari; application for rehearing was denied on December 19, 1956. * * *

"On September 5, 1960, Chief Justice Weygandt denied an application for a writ of habeas corpus in the Ohio Supreme Court; the petition therefor was dismissed on May 5, 1961.

"On April 11th, 1963, petitioner filed a petition for a writ of habeas corpus in this Court, which is the action giving rise to this order.

"Petitioner, Samuel H. Sheppard, has at all times maintained that he was not guilty of the murder of his wife, and that he knew no more about said death than he told at the trial."

---

1. "It is a minor point, but the Court notes that several of the dates of decisions are incorrectly stated."

## Appendix B

CLEVELAND NEWS, WEDNESDAY, NOVEMBER 3, 195_

# Blythin, Mahon Win Races For Common Pleas Bench

**BY SEVERINO P. SEVERINO**

Two prominent figures in the Dr. Sam Sheppard murder trial —Judge Edward Blythin and Prosecutor John J. Mahon,—were boosted to certain victory in the Common Pleas Court race here today.

Meanwhile, Frank J. Merrick, veteran of the Common Pleas bench, was a shoo-in for the Probate Court seat and Albert A. Woldman won the scramble for the Juvenile Court bench.

William K. Thomas, incumbent, seemed to be a cinch over J. J. P. Corrigan in another race for a Common Pleas judgeship.

### Five Unopposed

Those who will retain their judicial jobs for lack of opposition were Donald F. Lybarger, Daniel H. Wasserman, Harry A. Hanna, Joseph H. Silbert, Parker H. Fulton, Arthur H. Day and Walter T. Kinder in Probate Court.

Judge Blythin, presiding at the Sheppard murder trial, handed Fred W. Frey the most one-sided trouncing of the election. In 1,400 precincts of 2,080 Blythin led his opponent 208,835 to 47,137.

Blythin led his opponent 208,835 to 47,137.

Miller by a substantial majority of 187,505 to 43,078 in 1,400 precincts reported. Merrick was a ty prosecutor who leads the prosecution forces in the Sheppard case, coasted in over Perry B. Jackson who sought to elevate himself from the municipal bench where he has presided for many years.

Mahon led Jackson by more than 3,000 in returns from 1,400 precincts.

### Long Sought Bench

If Mahon isn't victim of a colossal reversal in the remaining ballots, he will realize a dream of many years. Long one of the ablest on the county's criminal prosecution staff, he has sought the Common Pleas bench several times before without success.

A Mahon victory may be one of several setbacks of the Cleveland Bar Association endorsements. His opponent Jackson was the choice of the Bar Association. Judge Blythin, however, was a Bar endorsement.

Judge Frank J. Merrick seemed to be the certain victor in the Probate Court bench race as he led his opponent Percy A. Mahon, veteran assistant county prosecutor who leads the prosecution forces in the Sheppard case, coasted in over Perry B. Jackson who sought to elevate himself from the municipal bench where he has presided for many years.

Woldman emerged victor over four other hopefuls who sought to unseat him from the Juvenile Court bench. He was pushed hardest by Clayborne George, veteran lawyer and Negro leader, who trailed Woldman by 17,000 votes in returns from 1,400 precincts. Trailing Woldman and George were John F. McCrone, B. Bill Murad and Michael P. O'Brien.

The major upset in the judicial race was fashioned by John Mahon who, in toppling Perry Jackson, defeated a strong runner in elections of past years.

Otherwise the election was without spectacular event such as an overturn of any incumbent. Merrick, one of the perennials of the judicial bench, safely engineered a shift from a Common Pleas to a Probate Court seat.

## CONGRATULATIONS!

Two of the principals in the Sheppard murder drama, Common Pleas Judge Edward Blythin, left, and Assistant County Prosecutor John Mahon, congratulate each other upon winning in their respective judicial races. Blythin won re-election, and Mahon realized a 35-year ambition when he won over Municipal Judge Perry B. Jackson in their contest for a seat on the Common Pleas bench.

## Appendix C

**SIDEWALK INTERVIEWS** of Sheppard trial figures were conducted on television this morning. Inspector Robert Fabian, formerly of Scotland yard, was holding the microphone in front of Criminal Courts Bldg. as Judge Edward Blythin breezed by.

# Appendix D

Cleveland Plain Dealer, Tuesday, December 21, 1954

**CORNERED** by reporters, Common Pleas Judge Edward Blythin announced he was going to let the Sheppard murder jury continue to deliberate, despite the record-breaking period it has been out. At right is Plain Dealer Reporter Todd Simon. Next to him is Bob Considine, International News Service star correspondent.

# Appendix E

Cleveland Press, Wednesday, November 3, 1954

**FINAL SAM SHEPPARD JURY** was photographed in court today by permission of Judge Edward Blythin as court recessed before the jury was to be taken to the Bay Village murder scene. Front row, left to right: Howard L. Barrish, Mrs. Elizabeth A. Borke, Edmond L. Verlinger, William C. Lamb, Mrs. Louise K. Feuchter, Jack Hansen. Back row: Mrs. Ann W. Foote, Mrs. Beatrice P. Orenstein, James C. Bird, Frank Moravec, Frank J. Kollarits, Mrs. Louella Williams and alternate Mrs. Lois Mancini.

# Actor Corrigan Raps Photographing of Jury

Puffing a big cigar, William J. Corrigan, defense lawyer for Dr. Sam Sheppard, staged quite an act in court today while cameramen photographed the Sheppard murder trial jury.

As Judge Edward Blythin recessed court for lunch he granted photographers long-waited permission to take pictures of the jurors in the jury box.

They came into the room, some perching on chairs, some on tables, some on the judge's bench.

"Wait a minute," Corrigan roared. "I want to count something. There's one, two, three —yeah, seven photographers taking pictures of the jury, making a show out of this. A man's on trial for his life."

But the criminal lawyer was talking to a judgeless bench. Only cameramen and a few reporters were on hand.

## "I Object . . ."

Corrigan sat down again at the rear end of the trial table, puffing his cigar, watching proceedings. More cameramen entered, calling to the jurors, "Look this way, please," and "Hold it a moment, please."

Judge Blythin stuck his head in through the door directly behind his bench.

"If the court please," shouted Corrigan at Blythin, "I object to all this."

But Blythin just picked up a book off the bench and vanished without saying a word.

Then Corrigan called to Bailiff Edgar Francis: "Francis, will you call the court stenographer back?" In a moment the court reporter reappeared and set up his stenotype machine right by the defense lawyer, who dictated as he smoked.

"After the jury was discharged at the end of the morning session, at the request of the newspapers the jury was brought back into the room and sat in the room for a matter of—15 minutes?—no, 10 minutes, and were subjected to photography and television cameras by at least 10 cameramen who mounted themselves on chairs, the judge's bench and various parts of the room."

Corrigan paused a moment to puff his cigar, then said: "This was all done out of the presence of the defendant, Sam Sheppard."

Then he told the court reporter, "Just be able to read this off in court so that I can take exception."

He turned his attention back to his cigar.

346 F.2d—48½

Appendix F

# The Clevelanc

*The Newspaper That Serves Its Read*

NO. 24113 CLEVELAND, SATURDAY, NOVEMBER (

# 35 RESCUED IN TEI

## 28

Beatrice Orenstein

Lois Mancini

Louella Williams

Louise Feuchter

Elizabeth Borke

Ann Foote

Thirty-fiv
cued when
brick tenen
In a serie
had been c
dropped 10
into the ar
injured.
The fire
Felder, 12,
up a stairw

## Bly

## to

## Sar

A showdov
Samuel H. S
Judge Edv
and possible
be necessary
of the case o.
school sweeti
Chief Defer
liam J. Corri
would "take
need" for det
ination of ev
witness.
Corrigan inc
object to long
because they 1
Assistant Pr
Mahon said
great latitude
right to ask al
tions."

## Women Jurors Give Colorful Backdrop
## to Drab, Grim Scene at Murder Trial

By RICHARD McLAUGHLIN

Housewives all, mothers all but one, the six women' on the Sam Sheppard jury have pushed into the background their normal family routines to serve—how long nobody knows—as judges of evidence in the nation's most sensational murder trial since the Lindbergh baby kidnap-murder case.

In a trial in which, so far,

for comfort—in conservative clothing to keep them warm outdoors and at ease during the long hours in the jury box.

**All Like Small Hats**

They all favor small, off-the-face hats and all wear earrings. Four of the six have short hair trims, the other two let their hair-dos frame their faces.

Take Mrs. Elizabeth Borke.

forward,

Next to her sat Mrs. Beatrice P. Orenstein, 33 - year - old mother of two. She wore a turquoise sweater with a white cardigan over it, and a light colored skirt. A string of pearls was knotted in front and her hat was well back on her brown hair. She lives at 12712 Phillips Ave., East Cleveland.

piece gray suit with white cuffs and a white collar with broad lapels. Pearls were tight about her throat and right wrist and she had on a black off-the-face hat, which set off her bangs and long curling brown hair.

There's nothing pleasant about the business these six women have been going about for three weeks

**Ready**

Mahon added cution would tious question

Appendix G

# Bay Policeman Describes Scene of Murder

Continued from Page 24

about the night chain on the Lake Rd. side of the Sheppard house.

**Q.:** Was that all right when you first arrived?

**A.:** It was all right when I examined it on the morning of July 4 after my arrival.

**Q.:** When did you next see that chain?

**A.:** I saw it the next day, July 5.

**Q.:** Describe the condition of that night chain when you saw it on July 5.

**A.:** The portion where the chain hooks onto the frame of the door had been pulled out. That is attached to the door by four screws and these had all been pulled out.

(State's Exhibit 19, Marilyn's watch, was handed to Garmone and he studied it very carefully. Dr. Sam pulled out his book "Meditations in a Prison Cell" and read with Marilyn's watch. Dr. Sam called Corrigan over to his side and they had a long conversation, with Sam doing most of the talking.)

**Cross-Examination**

At 11:20 a.m. Patrolman Drenkhan completed his direct testimony and Defense Council Corrigan began cross-examination.

**Q.:** In the time you have been in the Police Department you knew Dr. Sheppard and Marilyn well?

**A.:** Yes.

**Q.:** You knew them socially as well as officially?

**A.:** Yes.

**Q.:** You visited them at their home?

**A.:** Not socially.

**Q.:** Were you there at any time other than July 4?

**A.:** I was there with the defendant early this spring to ask him to help the Police De-

first time since the trial began Sam Sheppard spoke aloud in the courtroom. He looked across the trial table to where Corrigan was standing in front of the jury box and said, "It was at the corner of Cahoon and Center Ridge Rd." As Corrigan started to re-

peat the roads, Sheppard turned his head toward Drenkhan on the witness stand and said, "No, it was Chagrin Rd." Corrigan then said, "The point is this, when there was an accident in the city Dr. Sheppard was the one you called and he responded, is

that right?

**A.:** Yes, sir.

**Q.:** Did you come to a conclusion as to what kind of man Dr. Sheppard was up to July 4?

**A.:** I felt he was a very capable doctor and handled himself well in emergencies.

**Q.:** What was your opinion as to temperament?

**A.:** Very cool.

**Q.:** Even-tempered?

**A.:** Yes.

**Q.:** Did you ever see him lose his head?

**A.:** No.

**Q.:** Did you ever see him your wife?

**A.:** Yes.

**A.:** Average, normal.

**Q.:** The same as you, and angry?

**A.:** No.

**Q.:** Did you ever notice the conduct of Dr. and Mrs. Sheppard when they were together?

# Jurors Get Acquainted, Forget Trial at Lunch

AS THEY EAT, the Sheppard jurors become well acquainted. Mrs. Luella Williams (left) takes a cup from Mrs. Beatrice Orenstein.

TWO FEET HIGH on a radiator, juror Howard L. Barrish rests while he eats.

THERMOS BOTTLES of hot coffee brighten up lunches of the Sheppard trial jurors. Frank Kollarits pours for Mrs. Ann W. Foote.

Noon recess at the Sheppard murder trial is a highlight each day for members of the jury, offering welcome relief from the ardors of weighing every word of testimony.

Most of the jurors eat their lunches right in their jury room, bringing sandwiches from home or ordering them from a restaurant nearby. This saves them time and money and gives them a chance to talk with each other — about everything but the trial itself. That's forbidden.

To take these informal "jury at lunch" pictures, Press Cameraman Glenn Zahn got the permission of Judge Edward Blythin and had Bailiff Edgar Francis stand with him in the jury room as witness to the fact that Zahn spoke not a word to the jurors.

# Appendix H

After the death of a daughter, Mary Jane, in 1924, Mrs. Mahon and her husband reared the daughter's six children. She was one of the oldest members of St. Philomena's Catholic Church.

She is survived by the judge-elect; another son, James of Hollywood, Fla., a retired sales manager of the P. G. Geier Co.; two daughters, Miss Celia, a private secretary at Carling's who lived with her mother, and Mrs. Rose Elskar. Also surviving are eight grandchildren and great-grandchildren.

Services in St. Philomena's Church will be announced later. Flynn-Froelk Funeral Home, 13104 Euclid Ave., East Cleveland, is in charge of arrangements.

D. N. Pritt, who successfully defended Jomo Kenyatta against charges of inciting the Mau Mau fighting in Kenya.

Other prize winners included Prof. Salvatore Quasimodo of Colombia, Cuban Poet Nicolas Guillen, German Playwright Bertold Brecht, French Felix Guill, for a 1933 wife murder, was discharged in disagreement after a little more than four days' deliberation. Lamson eventually was set free.

It took 49 hours for a Honolulu jury to return a manslaughter conviction against Navy Lieut. Thomas H. Massie and others charged with first-degree murder in the kidnap killing of a man accused with attempting to rape Mrs. Ann sie.

"Burning Spear" Andre Bonnard of Lausanne University, Switzerland, and Allan le Leap, secretary-general of the French Confederation of Labor.

(No Americans were on the list. The Stalin prizes usually vary from 200,000 rubles to 50,000 rubles. For purposes of foreign exchange, Russia values the ruble at four to the American dollar.)

The fourth jury that tried David Lamson at San Jose, Calif., for a 1933 wife murder, was discharged in disagreement after a little more than four days' deliberation. Lamson eventually was set free.

In the Pittsburgh trial of James J. Flannery for murder in 1922, the jury took 14 days to bring in a verdict, finally acquitting Flannery of a charge of killing his wife.

manager, was abruptly reminded of that his family Christmas cards—handed to him by his wife last Friday morning—were still unmailed in his car, parked across the street from the courthouse.

A buzz brought Bailiff Eddie Francis to the rescue to recover them from a parking lot attendant—and also caused a wave of excitement in the courtroom, where the buzzer was heard as a sign that a verdict might be near.

Mrs. Louise Feuchter, the senior woman member of the jury, wondered if her husband was satisfactorily feeding her cats in their home at 3541 Warren Rd.

And how are the five children at the home of Mrs. Ann

His courtroom appearance He—as well as th hopes to be "home! mas."

"Oh, there's no home for the holiday

**Foreign Policy Names Witman**

Shepherd L. Witm tive director of the World Affairs, elected a director o eign Policy Assn. of.

Also retained dire Brooks Emeny, for dent of the Clevela who headed FPA former Press repo 1952, and Clayton deputy chairman of cratic National Cor

**HUSTLING FROM ONE WHODUNIT TO ANOTHER** is Judge Edward Blythin (center). He's shown striding across the hall of Criminal Courts Bldg. from his own Courtroom No. 1 to join Judges Parker Fulton and Arthur Day in Courtroom No. 3 for another first degree murder trial, in which the defendant, Curtis E. Chaney, waived jury trial and is entrusting his fate to a panel of three judges. "I can be back in a few minutes if the Sheppard jury reaches a verdict," Blythin said. Bailiff Eddie Francis is at right.

**BELIEVED NEAR VERDICT**, the Sheppard jurors looked like this as they prepared to leave Hotel Carter this morning to resume deliberations. Left to right are Howard L. Barrish, Mrs. Elizabeth Borke, Frank Moravec, Mrs. Ann Foote, Edmond Verlinger, Mrs. Louella Williams.

**THEIR LAST BREAKFAST TOGETHER?** The other six members of the panel posed together for this ph after breakfast. Left to right are Jack Hansen, Mrs. Louise Feuchter, William Lamb, James Bird, Mrs. Orenstein, Frank Kollarits.

THE CLEVELAND PRESS, Thursday, Nov. 25, 1954

PAGE 4

DOUBLE DATE with his daughters while Mom's in the jury box finds William Mancini helping Kathy with her school work while giving Nancy a ride.

WATCHING FOR MOM to come home from court has become the habit of Nancy Mancini and her older sister, Kathy, in the past six weeks.

## Harried Dad Barely Gets By as Mom Aids Sheppard Jury

GRANDMA TAKES OVER in feeding Nancy Manci 17 months, while Mrs. Lois Mancini is hearing Sheppard trial testimony.

By RICHARD McLAUGHLIN

If you've wondered how families of the women jurors in the six-week-old Sheppard trial have been getting along, here's the word from William Mancini:

"Just barely."

At the neat, modest-sized Mancini home at 16920 Stockbridge Ave. the new, trialinflicted routine goes like this:

DAD UP EARLIER than usual, fixing breakfasts for self and daughters, Kathy 7, and Nancy, 17 months.

MRS. LOIS MANCINI dressing up and leaving promptly at 8:15 a.m. for her daily date in the alternate juror's chair at the murder trial.

"And I've had to run shopping errands downtown that I ordinarily would never do."

Mrs. Fisher, an active clubwoman and volunteer worker, has had to give up numerous functions to pinch-hit for her daughter.

She has lived with the Mancinis since she became a widow in 1948. She said Lois lost her two younger brothers in World

# The Cleveland Press

*The Newspaper That Serves Its Readers*

CLEVELAND, WEDNESDAY, NOVEMBER 24, 1954

NO. 24128

Final

32 Pages—7 Cents

Phone CHerry 1-1111

# SAM CALLED A "JEKYLL-HYDE" BY MARILYN, COUSIN TO TESTIFY

## Describes 50

Two days before her death, murdered Marilyn Reese Sheppard told friends that her accused husband, Dr. Samuel H. Sheppard, was "a Dr. Jekyll and Mr. Hyde."

The prosecution has a "bombshell witness" on tap who will testify to Dr. Sam's display of fiery temper— countering the defense claim that the defendant is a gentle physician with an even disposition.

One of Mrs. Sheppard's "Dr. Jekyll and Mr. Hyde" statements was made to Bay Village Mayor J. Spencer Houk as recently as last June, The Press learned.

Houk, according to his statement to the authorities, had expressed surprise at Marilyn's account of a dis-play of Sam's anger.

"You don't know that guy," he quoted the murder victim as replying. "He's a regular Dr. Jekyll and Mr. Hyde. . . ."

Mrs. Sheppard used the "Jekyll-Hyde" expression frequently in confidential conversations during the past several years, friends and relatives have told the murder investigators.

The "bombshell witness" is Thomas Weigle, 26, of 13897 Nelanere Rd., East Cleveland, Marilyn's first cousin.

Weigle and his wife, Marian, and son, Gordon, visited Sam and Marilyn Sheppard's home at 28924 Lake Rd., Bay Village, a Sunday in March, 1952.

The two women were in the kitchen, Weigle related, while he and Dr. Sam were watching a western movie on television. The Sheppards' only son, Sam (Chip) Jr., then five years old, was playing in the room.

Chip, Weigle said, tapped his father's arm—either playfully or accidentally.

"Sam's face reddened," Weigle continued. "He whisked the boy up, tossed him across his legs, and began beating him on his back, legs and buttocks.

"As he struck the boy repeatedly, Sam said: 'Don't you ever hit me again. . . . Don't you ever do that again'. . ."

Weigle said he was astonished. "I told him, 'Sam, take it easy. . .'. But he ignored me. I couldn't stand it, so I got up and walked out of the living room. He continued to beat the boy all the time I was walking out."

When he went into the kitchen, Weigle said, he asked Marilyn: "Does this happen very often?"

And she answered, he said: "You ought to see some of the tirades he goes into around here."

Weigle said the word "tirade" fixed the remark

Turn to Page 3, Column 3

Appendix K

# 'Bare-Faced Liar,' Kerr Says of Sam

Capt. David E. Kerr, head of Cleveland's homicide bureau, today called Dr. Samuel H. Sheppard a "bare faced liar" for his testimony that homicide detectives mistreated him.

"If ever a person was handled with kid gloves, it was Dr. Sam," said Kerr. "In 800 homicide cases we have not had a single voice raised against our methods, until this one from the Bay Village doctor."

Detectives accused by Dr. Sheppard of subjecting him to a cruel inquisition, promising him steak dinners or freedom on bond if he would confess or plead insanity, were Robert Schottke, Patrick Gareau; Lawrence Doran, Adelbert O'Hara, James McHugh; Peter Becker, and Charles Lonchar.

The osteopath said that O'Hara called him a "dirty low down s-o-b," and insulted members of his family and told him he had ruined Bay View Hospital and Mayor Spencer Houk of Bay Village.

"Lies—nothing of that sort transpired," said Capt. Kerr. "There was no third degree, no offer of a deal—that's ridiculous. We can't make deals. That's up to the court."

Detectives who questioned Dr. Sheppard in relays in County Jail last August said they were rarely alone with the prisoner because his lawyers "spelled each other off" in interrupting their interrogation.

CLEVELAND NEWS
December 11, 1954